[This opinion has been published in *Ohio Official Reports* at 82 Ohio St.3d 426.]

COPE ET AL., APPELLANTS, *v.* METROPOLITAN LIFE INSURANCE COMPANY ET AL., APPELLEES.

[Cite as *Cope v. Metro. Life Ins. Co.*, 1998-Ohio-405.]

*Civil procedure—Class actions—Trial court abuses its discretion in denying class certification on the basis that plaintiffs failed to satisfy Civ.R. 23(B)(3)'s requirement of predominance and superiority when it fails to give adequate consideration to whether the asserted claims are susceptible of class-wide proof.*

(No. 97-567—Submitted February 17, 1998—Decided July 29, 1998.)

APPEAL from the Court of Appeals for Columbiana County, No. 95-CO-46.

————————————

{¶ 1} This is an appeal from a decision affirming the trial court's order denying certification of a class action. The action was brought by plaintiffs-appellants, Wayne A. Cope, Dallas G. Few, and Ronald W. Speidel, on behalf of themselves and others similarly situated, against defendants-appellees, Metropolitan Life Insurance Company and Metropolitan Life Insurance and Annuity Company ("MetLife"), to challenge certain methods used in the procurement of life insurance.

{¶ 2} Cope initially purchased life insurance from MetLife in 1971, and purchased additional life insurance from MetLife in 1983, 1984, and 1991. MetLife surrendered the cash value that had accumulated in Cope's 1971 policy, and used the money to fund or pay premiums on Cope's 1983 policy. MetLife also surrendered the accumulated cash value of Cope's 1983 and 1984 policies, and used the money to fund or pay premiums on Cope's 1991 policy.

{¶ 3} Few purchased life insurance from MetLife in 1967, 1973, and 1990. MetLife caused a dividend withdrawal from Few's 1973 policy, and a loan to be

taken from Few's 1967 policy, and used the money and proceeds either to fund or pay premiums on his 1990 policy. After Few became aware that MetLife was taking value from his 1967 and 1973 policies to finance his 1990 policy, Few requested MetLife to reinstate the cash value and dividends of his 1967 and 1973 policies. When MetLife refused, Few surrendered his 1990 policy.

{¶ 4} Speidel purchased life insurance from MetLife in 1987 and 1993. MetLife twice partially cash-surrendered Speidel's 1987 policy to fund or pay premiums on his 1993 policy.

{¶ 5} In their amended complaint, appellants alleged that MetLife improperly used the cash values, dividends, and interest that had accumulated in their existing life insurance policies to finance their purchases of additional life insurance. According to the complaint:

"Beginning in or about 1983, MetLife, through its agents, developed, implemented and otherwise approved a widespread scheme to obtain higher commissions and extra charges by selling existing MetLife policyholders policies that were classified and/or charged as new policies when, in fact, they were replacement policies and should have been classified and/or charged as such."[1]

{¶ 6} The scheme, as summarized by appellants, worked as follows:

"Step 1: MetLife targeted *its existing policyholders* in Ohio using its computerized records;

---

1. According to the complaint, MetLife's commission structure was such that when a new life insurance policy was sold, the selling agent receives a commission of fifty-five percent or more of the new policy's entire first-year premium, and ten percent of each premium paid thereafter. However, when a replacement policy is sold, the agent receives a ten percent commission only on the premiums paid in addition to that of the existing policy. In addition, the complaint states that:

"MetLife sells replacement policies at reduced costs in comparison to *new* policies. MetLife charges for the sale of *new* policies are significantly higher than its charges for *replacement* policies. MetLife's charges for new policies may include a load charge, dump charge, expense charge, surrender charge, an annual charge and other administrative charges. When a replacement policy is sold, MetLife waives, reduces or does not charge some or all of these charges."

"Step 2: MetLife agents filled out policyholders' applications and had them execute applications for additional MetLife policies. The applications contained: (1) a written statement by the insured that existing insurance was *not* to be replaced and (2) a written statement by the agent that existing insurance was *not* to be replaced and that the state mandated risk warnings were *not* provided. *See* [Ohio Adm.Code] 3901-1-36(D) and (E);

"Step 3: Contrary to the policy application, a replacement transaction involving existing policies took place that was known or should have been known as such to MetLife and its agents; and

"Step 4: Despite the occurrence of the replacement transactions, a 'complete policy' disclosing the agreement to finance by replacement was *not* delivered to Policyholders nor were the state-mandated risk warning disclosure forms provided to Policyholders in connection with the replacement transactions in direct violation of [Ohio Adm.Code] 3901-1-36 *et seq.*" (Emphasis *sic.*)

{¶ 7} Based on these underlying allegations, appellants presented the following twelve claims for relief: (1) breach of contract, (2) contract entered upon a mutual mistake of fact, (3) contract entered on a unilateral material mistake of fact, (4) breach of fiduciary duty, (5) negligent supervision, (6) deceit by concealment, (7) common-law nondisclosure, (8) breach of duty of good faith and fair dealing, (9) violations of New York insurance law, (10) violations of New York general business law, (11) violations of the Delaware Consumer Fraud Act, and (12) prima facie tort.

{¶ 8} On May 1, 1995, appellants moved for class certification pursuant to Civ.R. 23(A) and (B)(3). In their motion, appellant sought to have certified a class consisting of:

"Ohio residents who were owners of existing life insurance or annuity policies with [MetLife] from 1983 to the present and were sold subsequent policies

that were classified and/or charged as new policies when, in fact, they were replacement policies and should have been classified and/or charged as such."

{¶ 9} On July 6, 1995, the trial court entered its order denying class certification. The court found that all of the prerequisites of Civ.R. 23(A) had been met, *i.e.*, identifiable class, class membership, numerosity, commonality, typicality, and adequacy of representation. However, the court found that appellants failed to satisfy Civ.R. 23(B)(3)'s predominance and superiority requirements because "an individual determination as to what the plaintiffs were told by their respective agents will be crucial in determining liability."

{¶ 10} The court of appeals affirmed the trial court's order, finding that "individualized proof" or "individualized scrutiny of each transaction" would be necessary to determine each claim. According to the court of appeals:

"[M]ost of appellants' claims relate to the intent or state of mind of the insured or the agent, or to whether appellants and each member of the proposed class [were] or [were] not given certain information. As the amended complaint is drafted, we cannot fathom how appellants intended to prove their claims without including oral testimony regarding each transaction."

{¶ 11} The cause is now before this court pursuant to the allowance of a discretionary appeal.

_____

*Murray & Murray* and *John T. Murray*; *McLaughlin, McNally & Carlin* and *Clair M. Carlin*; *Specter, Specter, Evans & Manogue, P.C., Howard A. Specter, David J. Manogue* and *Joseph N. Kravec, Jr.; Malakoff, Doyle & Finberg, P.C., Michael P. Malakoff* and *James M. Pietz*, for appellants.

*Porter, Wright, Morris & Arthur, Adele E. O'Conner, Patrick J. Smith* and *Charles C. Warner; Yeagley, Roberts & Kirkland* and *Robert C. Roberts*, for appellees.

*Waite, Schneider, Bayless & Chesley, Co., L.P.A.,* and *Louise M. Roselle*, urging reversal for *amicus curiae,* Ohio Academy of Trial Lawyers.

*Vorys, Sater, Seymour & Pease, F. James Foley* and *Richard M. Rolwing,* urging affirmance for *amici curiae,* Ohio Association of Life Underwriters and Association of Ohio Life Insurance Companies.

*Jones, Day, Reavis & Pogue, Stephen Goodman, Carol M. Stapleton* and *Harry I. Johnson III,* urging affirmance for *amicus curiae,* American Council of Life Insurance.

_____

**ALICE ROBIE RESNICK, J.**

**{¶ 12}** The issue presented is whether the trial court abused its discretion in denying class certification on the basis that appellants failed to satisfy Civ.R. 23(B)(3)'s requirement of predominance and superiority.[2]  For the reasons that follow, we hold that the trial court abused its discretion in failing to give adequate consideration to whether the asserted claims are susceptible of class-wide proof, thereby obviating the need for separate adjudications.

**{¶ 13}** Recently, the United States Supreme Court declared that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem Prods., Inc. v. Windsor* (1997), 521 U.S. ___, ___, 117 S.Ct. 2231, 2250, 138 L.Ed.2d 689, 713.  As the Supreme Court of California explained in *Vasquez v. Superior Court of San Joaquin Cty.* (1971), 4 Cal.3d 800, 808, 94 Cal.Rptr. 796, 800-801, 484 P.2d 964, 968-969:

_____

2. Civ.R. 23(B)(3) provides that an action may be maintained as a class action if, in addition to the prerequisites of subdivision (A), "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  The matters pertinent to the findings include:  (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (d) the difficulties likely to be encountered in the management of a class action."

"Frequently numerous consumers are exposed to the same dubious practice by the same seller so that proof of the prevalence of the practice as to one consumer would provide proof for all. Individual actions by each of the defrauded consumers is often impracticable because the amount of individual recovery would be insufficient to justify bringing a separate action; thus an unscrupulous seller retains the benefits of its wrongful conduct. A class action by consumers produces several salutary by-products, including a therapeutic effect upon those sellers who indulge in fraudulent practices, aid to legitimate business enterprises by curtailing illegitimate competition, and avoidance to the judicial process of the burden of multiple litigation involving identical claims. The benefit to the parties and the courts would, in many circumstances, be substantial."

{¶ 14} It is now well established that "a claim will meet the predominance requirement when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position." *Lockwood Motors, Inc. v. Gen. Motors Corp.* (D.Minn.1995), 162 F.R.D. 569, 580.

{¶ 15} As explained in the 1966 Advisory Committee Notes to Fed.R.Civ.P. 23(b)(3):

"Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results. * * *

"The court is required to find, as a condition of holding that a class action may be maintained under this subdivision, that the questions common to the class predominate over the questions affecting individual members. It is only where this predominance exists that economies can be achieved by means of the class-action device. In this view, a fraud perpetrated on numerous persons by the use of *similar misrepresentations* may be an appealing situation for a class action. * * * On the

other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was *material variation in the representations made or in the kinds or degrees of reliance* by the persons to whom they were addressed." (Emphasis added.)

{¶ 16} Courts generally find that the existence of common misrepresentations obviates the need to elicit individual testimony as to each element of a fraud or misrepresentation claim, especially where written misrepresentations or omissions are involved. They recognize that when a common fraud is perpetrated on a class of persons, those persons should be able to pursue an avenue of proof that does not focus on questions affecting only individual members. If a fraud was accomplished on a common basis, there is no valid reason why those affected should be foreclosed from proving it on that basis. See *Shields v. Lefta, Inc.* (N.D.Ill.1995), 888 F.Supp. 891, 893; *Murray v. Sevier* (D.Kan.1994), 156 F.R.D. 235, 248-249; *Davis v. Southern Bell Tel. & Tel. Co.* (S.D.Fla.1994), 158 F.R.D. 173, 176-179; *Mayo v. Sears, Roebuck & Co.* (S.D.Ohio 1993), 148 F.R.D. 576, 583; *Heastie v. Community Bank of Greater Peoria* (N.D.Ill.1989), 125 F.R.D. 669, 678; *Skalbania v. Simmons* (Ind.App.1982), 443 N.E.2d 352, 360; *Vasquez, supra*.

{¶ 17} Courts also generally find that a wide variety of claims may be established by common proof in cases involving similar form documents or the use of standardized procedures and practices. Most recently, in *Hamilton v. Ohio Sav. Bank* (1998), 82 Ohio St.3d 67, 77, 694 N.E.2d 442, 452, plaintiffs brought an action on behalf of themselves and others similarly situated to challenge certain methods used to amortize their residential mortgage loans. We reversed the trial court's denial of class certification, and allowed the action to proceed on plaintiffs' asserted common-law claims for breach of contract, fraud, conversion, waiver and estoppel, and unjust enrichment, as well as a statutory claim for violations of the Federal Truth in Lending Act, Section 1601 *et seq.,* Title 15, U.S.Code.

**{¶ 18}** In so doing, we explained as follows:

"In this case, the questions of law and fact which have already been shown to be common to each respective subclass arise from identical or similar form contracts. The gravamen of every complaint within each subclass is the same and relates to the use of standardized procedures and practices. No individual has attempted to institute a parallel action or to intervene in this action, and it is unlikely that any new suits will be filed given the relatively small individual recoveries and the massive duplication of time, effort and expense that would be involved. While the class is numerically substantial, it is certainly not so large as to be unwieldy. Class action treatment would eliminate any potential danger of varying or inconsistent judgments, while providing a forum for the vindication of rights of groups of people who individually would be without effective strength to litigate their claims. This appears to present the classic case for treatment as a class action, and cases involving similar claims or similar circumstances are routinely certified as such. *Am. Timber & Trading Co* [*v. First Natl. Bank of Oregon* (C.A.9, 1982)], 690 F.2d 781; *Goldman v. First Natl. Bank of Chicago* (C.A.7, 1976), 532 F.2d 10; *Cobb* [*v. Monarch Finance Corp.* (N.D.Ill.1995)], 913 F.Supp. 1164; *Hickey* [*v. Great W. Mtge. Corp.* (N.D.Ill.1994)], 158 F.R.D. 603; *Mayo v. Sears, Roebuck & Co.* (S.D.Ohio 1993), 148 F.R.D. 576; *Kleiner* [*v. First Natl. Bank of Atlanta* (N.D.Ga.1983)], 97 F.R.D. 683; *Hughes v. Cardinal Fed. S. & L. Assn.* (S.D.Ohio 1983), 97 F.R.D. 653; *Ingram* [*v. Joe Conrad Chevrolet, Inc.* (E.D.Ky.1981)], 90 F.R.D. 129; *Kaminski v. Shawmut Credit Union* (D.Mass.1976), 416 F.Supp. 1119; *Perlman v. First Natl. Bank of Chicago* (1973), 15 Ill.App.3d 784, 305 N.E.2d 236; *Landau v. Chase Manhattan Bank, N.A.* (S.D.N.Y.1973), 367 F.Supp. 992; *Partain v. First Natl. Bank of Montgomery* (M.D.Ala.1973), 59 F.R.D. 56; *Cohen* [*v. Dist. of Columbia Natl. Bank* (D.D.C.1972)], 59 F.R.D. 84*; Eovaldi v. First Natl. Bank of Chicago* (N.D.Ill.1972), 57 F.R.D. 545; *Goebel v. First Fed. S. & L. Assn. of Racine* (1978), 83 Wis.2d 668, 266 N.W.2d 352; *Vickers v. Home Fed. S. & L.*

*Assn. of E. Rochester* (1976), 87 Misc.2d 880, 386 N.Y.S.2d 291, affirmed (1977), 56 A.D.2d 62, 390 N.Y.S.2d 747; *Silverstein v. Shadow Lawn S. & L. Assn.* (1968), 51 N.J. 30, 237 A.2d 474; 5 Moore's Federal Practice [3 Ed.1997] at 23-251, Section 23.47[5]."

{¶ 19} Also, claims based on an underlying scheme are particularly subject to common proof. As the court in *Murray, supra*, 156 F.R.D. at 249, explained:

"[I]t would be senseless to require each of the members * * *, numbering over half a million, to individually assert their fraud claims against the defendants, especially where a single 'underlying scheme,' rather than a variety of distinct misrepresentations, is the fundamental basis for those claims. *In re American Continental/Lincoln S & L Sec. Litig.* [D.Ariz.1992], 140 F.R.D. [425] at 431 ('It is the underlying scheme which demands attention. Each plaintiff is similarly situated with respect to it, and it would be folly to force each bond purchaser to prove the nucleus of the alleged fraud again and again.')." See, also, *Heastie, supra*, 125 F.R.D. at 676, fn. 6 ("[I]f [plaintiff's] legal theory is correct, and if she can establish the existence of such a scheme—two questions that are common to the class—liability to individual class members could be determined by an examination of the various documents signed.)."

{¶ 20} In *State ex rel. Metro. Life Ins. Co. v. Starcher* (1996), 196 W.Va. 519, 474 S.E.2d 186, the Supreme Court of West Virginia rejected MetLife's argument that "individual inquiry is necessary to ascertain the respective intentions of each prospective class member concerning the funding of the additional policy of insurance that they purchased," and certified a class action brought against MetLife identical to the one now before this court. In doing so, the court affirmed that plaintiffs' "common law claims are not based upon oral testimony but are instead based upon proof of the standard form documents utilized by the defendant [MetLife] in its processing of insurance applications and the issuance of life

insurance policies and the standardized rules, procedures and conduct of the defendant in handling these matters." *Id.*, 196 W.Va. at 523, 474 S.E.2d at 190.

{¶ 21} An identical case was also certified as a class action against MetLife in California. *Green v. Metro. Ins. & Annuity Co.* (Apr. 30, 1997), Cal.Super.Ct., San Francisco County No. 969547, unreported, petition for review and application for stay denied, *Metro. Ins. & Annuity Co. v. San Francisco Cty. Sup. Ct.* (Dec. 5, 1997), Cal. No. S065789, unreported.

{¶ 22} The courts below, however, found themselves unable to envision how the claims of the entire class could be established at trial without separately adjudicating the circumstances surrounding each class member's purchase of additional insurance. They reasoned that since appellants' claims contained allegations that they were not furnished certain information, they and the other class members would necessarily have to present testimony as to what they were separately told or not told by the agents with whom they respectively dealt.

{¶ 23} However, appellants' claims are not based on any oral or affirmative misrepresentations, or any other actionable conduct occurring during pre-application sales negotiations.[3] The gravamen of appellants' complaint is that MetLife engaged in a scheme to collect larger commissions and front-end load

---

3. In *Starcher*, the trial court had identified the relevant MetLife conduct as that occurring " 'at or post-contracting.' " *Id.*, 196 W.Va. at 522-523, 474 S.E.2d at 189-190, and fn. 7. In so doing, that court found it necessary to distinguish the trial court's decision in this case on the basis that the plaintiffs in *Starcher*, unlike the plaintiffs in *Cope*, were not alleging " 'oral misrepresentations or any other actionable conduct *prior* to the time of contracting for life insurance.' " (Emphasis *sic*.) *Id.*, 196 W.Va. at 523, 474 S.E.2d at 190, fn. 7. Apparently, the West Virginia court was under the mistaken impression that appellants in this case had actually based their claims on pre-sales oral misrepresentations. However, the trial court's decision in the instant case makes clear that "[p]laintiffs claim that this case is to be decided strictly on the standard written policy contracts, not upon any oral misrepresentations of MetLife or its agents." In any event, and regardless of the interpretation accorded the trial court's opinion, it is abundantly clear from the arguments and record in this case that appellants' claims are in no way based on oral misrepresentations or other pre-application conduct, and thus are legally and factually indistinguishable from those in *Starcher*.

charges by intentionally omitting the state-mandated written disclosure warnings when issuing replacement life insurance.

**{¶ 24}** Former Ohio Adm.Code 3901-1-36(E) (now 3901-6-05[E]) required each agent to submit a signed statement as to whether replacement is or may be involved in the transaction. Where replacement is involved, the agent must provide the applicant a standardized written "Notice Regarding Replacement of Life Insurance" and obtain a list of all existing life insurance to be replaced. With regard to each appellant, the record contains a "Sales Representative's Report," which indicates that the transaction is not a replacement and that no replacement forms were completed. These reports, which are part of each contract and extant in MetLife's own records, provide objective written verification that the required disclosures were not made. These standard documents could be used to establish MetLife's failure to distribute the mandated disclosure warnings, thereby obviating the need for testimony as to what each class member was told or not told by agents with whom they dealt.

**{¶ 25}** MetLife argues, however, that "[i]ndividual proof is needed to determine the threshold question of whether any written replacement notice was required." According to MetLife, separate determinations would have to be made as to whether the insured intended to reduce existing coverage and whether the agent knew or should have known of the insured's intent. We disagree.

**{¶ 26}** Ohio Adm.Code 3901-1-36(E)(1)(a) requires "[a] statement signed by the applicant as to whether or not such insurance will replace existing life insurance." The relevant statutory provisions governing life insurance make clear that anything pertaining to the issuance or delivery of life insurance in Ohio must be incorporated into a single instrument, which shall constitute the entire contract between the parties and serve as objective evidence of negotiations and notice of all matters by which they are bound. R.C. 3911.04 and 3915.05(C); *Pannunzio v. Monumental Life Ins. Co.* (1958), 168 Ohio St. 95, 101, 5 O.O.2d 356, 359, 151

N.E.2d 545, 549; *Washington Fid. Natl. Ins. Co. v. Burton* (1932), 287 U.S. 97, 99-100, 53 S.Ct. 26, 27, 77 L.Ed. 196, 197-198; *Inter Ins. Exchange of the Chicago Motor Club v. Milwaukee Mut. Ins. Co*. (1978), 61 Ill.App.3d 928, 930, 18 Ill.Dec. 927, 930, 378 N.E.2d 391, 394; *Tannenbaum v. Provident Mut. Life Ins. Co. of Philadelphia* (1976), 53 A.D.2d 86, 103-105, 386 N.Y.S.2d 409, 420-422, affirmed (1977), 41 N.Y.2d 1087, 396 N.Y.S.2d 351, 364 N.E.2d 1122. Accordingly, each class member's intent not to replace existing insurance could be established by his or her Ohio Adm.Code 3901-1-36(E)(1)(a) statement, without any further evidence of intent.

{¶ 27} The agent's state of mind can also be established without individual testimony. Under the Ohio Administrative Code, disclosure is triggered by replacement. Former Ohio Adm.Code 3901-1-36(D)(1) defined "replacement" by using a "known or should have known" standard with reference to the proposing agent. This standard was specifically chosen to eliminate "the problem of proof of the agent's state of mind." Model Regulation Service, Legislative History of NAIC Proceedings on Replacement of Life Insurance and Annuities Model Regulation (July 1994) 613-12, Section 2.

{¶ 28} In conducting an examination of MetLife's replacement activities in Pennsylvania, that state's Deputy Insurance Commissioner explained that "[w]hen an insurer engages in the replacement of its own insurance policies and annuities, both the agent and the insurer have a clear understanding of replacement activity." Commonwealth of Pennsylvania, Insurance Department, Report of Market Conduct Examination of the Metropolitan Life Ins. Co., New York, N.Y. as of December 27, 1993 (Feb. 11, 1994) 10, Section V. The record in this case includes evidence of MetLife's policies and procedures designed to track internal replacement transactions. If appellants' legal theory is correct, and if they can establish that MetLife has or should have the general ability to track its own replacement activity, it could be determined on a common, class-wide basis that MetLife's agents knew

or should have known that written disclosure warnings were required. Accordingly, it cannot be concluded that such an inquiry would necessarily be individual in nature.

{¶ 29} MetLife argues that "[t]he elements of Appellants' claims, such as falsity, reliance and causation, also require individual proof." In support, MetLife relies heavily on *Simpson v. Prudential Ins. Co. of Am.* (Aug. 8, 1994), Butler App. No. CA93-09-173, unreported, 1994 WL 409656, as did the court of appeals.

{¶ 30} In *Simpson*, the court concluded that plaintiffs' own claims created individual and disparate issues because they were based on alleged oral rather than written misrepresentations. Similarly, other courts considering the reliance issue have decided the certification question based on whether the alleged misrepresentations were varied or oral as opposed to uniform or written. Compare, *e.g.*, *Elliott v. ITT Corp.* (N.D.Ill.1992), 150 F.R.D. 569, 583, and *Murray, supra*, 156 F.R.D. at 248-249. Under this view, appellants' claims present the classic case for treatment as a class action because they are based on written documents that uniformly indicate the omission of standard disclosure warnings. See *Davis, supra*, 158 F.R.D. at 176-178.

{¶ 31} In *Simpson*, the court also relied on our decision in *Schmidt v. Avco Corp.* (1984), 15 Ohio St.3d 310, 15 OBR 439, 473 N.E.2d 822, for the proposition that class certification is properly denied when claims require proof of inducement and reliance. However, we explained in *Hamilton* as follows:

"Next, relying in part on our decision in *Schmidt, supra*, 15 Ohio St.3d 310, 15 OBR 439, 473 N.E.2d 822, Ohio Savings argues that class certification is properly denied where elements of inducement and reliance must be proven on an individual basis. Thus, Ohio Savings concludes, the trial court properly rejected class action treatment of appellants' claims for fraud, waiver, estoppel and unjust enrichment.

"In *Schmidt*, plaintiffs claimed in part that they were entitled to compensation from their former employer pursuant to a written separation pay policy. In affirming the denial of certification, we agreed with the court of appeals that '[i]f this claim is viewed as raising the doctrine of promissory estoppel, * * * then the circumstances of each individual employee would need to be analyzed and the elements of inducement and reliance would have to be proven with respect to each individual member of the proposed class.' *Id.*, 15 Ohio St.3d at 314, 15 OBR at 443, 473 N.E.2d at 825.

"However, *Schmidt* did not purport to establish a rule that any claim containing a necessary element of reliance is *ipso facto* excluded from class action treatment. The drafters of Civ.R. 23 could easily have expressed such an exclusion had that been their intent. Instead, the elements of inducement and reliance defeated class certification in *Schmidt* 'because the claims raised involve[d] *noncommon issues* that are either inextricably entangled with common issues or are too unwieldy to be handled adequately on a class action basis.' (Emphasis added.) *Id.,* 15 Ohio St.3d at 314, 15 OBR at 442, 473 N.E.2d at 825.

" * * *

" * * * [C]lass action treatment is appropriate where claims arise from standardized forms or routinized procedures, notwithstanding the need to prove reliance. * * *

"Moreover, the situation here is markedly different from that in *Schmidt*. Unlike in *Schmidt,* proof of reliance will not require separate examination of each prospective class member. Instead, proof of reliance in this case may be sufficiently established by inference or presumption. * * * As explained by the Sixth Circuit in *Michaels Bldg. Co.* [*v. Ameritrust Co., N.A.* (C.A.6, 1988)], 848 F.2d [674] 679, fn. 8, 'since plaintiffs knew that defendants' loan statements offered a certain prime rate (which allegedly misstated the true prime rate), this information, it must be

inferred, influenced plaintiffs' decision to borrow money from those defendant banks.' " (Citations omitted.) *Id.*, 82 Ohio St.3d at 83-84, 694 N.E.2d at 456.

**{¶ 32}** It is not necessary to establish inducement and reliance upon material omissions by direct evidence. When there is nondisclosure of a material fact, courts permit inferences or presumptions of inducement and reliance. Thus, cases involving common omissions across the entire class are generally certified as class actions, notwithstanding the need for each class member to prove these elements. See *Davis, supra*, 158 F.R.D. at 176-177; *Murray, supra*, 156 F.R.D. at 249, fn. 11; *Heastie, supra*, 125 F.R.D. at 678; *Adams v. Little Missouri Minerals Assn.* (N.D.1966), 143 N.W.2d 659, 683; 37 American Jurisprudence 2d (1968) 305, Fraud and Deceit, Section 228. See, also, *Skalbania, supra*, 443 N.E.2d at 360; *Vasquez, supra*, 4 Cal.3d at 814-815, 94 Cal.Rptr. at 805, 484 P.2d at 972-973.

**{¶ 33}** The drafters of the Model Regulation were concerned "over the harmful and adverse effects upon policyholders and upon the life insurance industry generally, of the increasing replacement of existing policies of life insurance. * * * [O]rdinarily [replacement] is not in the interest of the insured." The goal of the task force appointed to review the regulation "was to require the disclosure of all pertinent facts concerning the sale of new life insurance, including the status of the policy subject to replacement. Timely disclosure was also made a priority." Model Regulation Service, Legislative History, *supra*, at 613-11, Section 1. Former Ohio Adm.Code 3901-1-36(I)(1) provided:

"Failure to comply with the requirements of this rule shall constitute an omission or incomplete comparison, which misrepresents the benefits, advantages, conditions or terms of an insurance policy, for the purpose of inducing or intending to induce a policyholder in any company to lapse, forfeit, change or surrender life insurance."

**{¶ 34}** Thus, if appellants can establish by common proof and/or form documents that MetLife, through its agents, was required and failed to give the

mandated disclosure warnings, then at least an inference of inducement and reliance would arise as to the entire class, thereby obviating the necessity for individual proof on these issues.

{¶ 35} MetLife next argues that "[a]ppellants' claims based on breach of fiduciary duty cannot be proven without transaction specific proof." Yet, a substantial portion of MetLife's argument is devoted to establishing the proposition that the sale of life insurance does not create a fiduciary relationship between insurance companies and policyholders as a matter of law. Of course, the question whether a replacing insurer owes a fiduciary duty to the applicant to issue the mandated disclosure warnings is a question going to the merits of the action, which cannot be determined at the certification stage. *Ojalvo v. Bd. of Trustees of Ohio State Univ.* (1984), 12 Ohio St.3d 230, 233, 12 OBR 313, 316, 466 N.E.2d 875, 877; *Skalbania, supra*, 443 N.E.2d at 361. However, the very argument that such an issue can be determined on a class-wide basis as a matter of law stands diametrically opposed to MetLife's assertion that such issue necessarily requires transaction-specific proof.

{¶ 36} In any event, the alleged circumstances surrounding each transaction present a common fact situation—MetLife agents targeted existing MetLife policyholders, sold them replacement insurance as new insurance, and intentionally omitted the mandated disclosure warnings in violation of statutory and regulatory provisions and MetLife's own policies and procedures. If the jury finds that a reasonable person under these circumstances would repose special confidence and trust in MetLife to disclose material information, it may infer the existence of a fiduciary duty across the entire class. See *Logsdon v. Natl. City Bank* (C.P.1991), 62 Ohio Misc.2d 449, 461-462, 601 N.E.2d 262, 270; *Vasquez, supra*, 4 Cal.3d at 814, 94 Cal.Rptr. at 805, 484 P.2d at 973, fn. 9. It may be that appellants "will not be able to establish, factually or legally, that a fiduciary relationship exists. The

predominant common question is still, however, the conduct of the defendants, a common question of fact." *Skalbania, supra*, 443 N.E.2d at 361.

**{¶ 37}** MetLife also argues that "[a]ppellants' deposition testimony further demonstrates the individual nature of their contract claims." We disagree. The testimony to which MetLife refers had nothing to do with appellants' allegations, but instead were responses to questions posed by MetLife's counsel. At best, "the responses of class members to those questions * * * represented not legal claims, but unformed and unselfconsciously presented impressions. To determine what legal claims plaintiffs allege, a judge must look not to defendant's interrogatories but to plaintiffs' complaint." *Cox v. Am. Cast Iron Pipe Co.* (C.A.11, 1986), 784 F.2d 1546, 1557. As one court noted, "it is often the defendant, preferring not to be successfully sued by anyone, who supposedly undertakes to assist the court in determining whether a putative class should be certified. * * * [I]t is a bit like permitting a fox, although with a pious countenance, to take charge of the chicken house." *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130, U.A.* (C.A.7, 1981), 657 F.2d 890, 895.

**{¶ 38}** In light of all the foregoing, we conclude that the trial court abused its discretion in denying class certification. Indeed, we cannot imagine a case more suited for class action treatment than this one. This case involves the use of form documents, standardized practices and procedures, common omissions spelled out in written contracts, and allegations of a widespread scheme to circumvent statutory and regulatory disclosure requirements, any one of which has been held to warrant class action treatment. Courts in West Virginia and California have already certified identical actions against MetLife, and the Insurance Commissioner in Pennsylvania has found MetLife to have engaged in a pattern and practice of similar replacement activity there.

**{¶ 39}** Accordingly, the judgment of the court of appeals is reversed, and the cause is remanded to the trial court for further proceedings.

*Judgment reversed*

*and cause remanded.*

MOYER, C.J., DOUGLAS, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

_____