OPINION
{¶ 1} Plaintiff-appellant David Cannon appeals from the May 9, 2005, Judgment Entry of the Muskingum County Court of Common Pleas denying his request for class certification.
 STATEMENT OF THE FACTS AND CASE {¶ 2} Appellee Fidelity Warranty Services markets and administers extended service contracts that cover repairs to used automobiles. The service contracts are sold by car dealerships to consumers in connection with the sale of a used automobile. Between November 1, 1999, and mid-summer 2003, appellee sold at least 14,527 service contracts to consumers in Ohio through 85 different automobile dealers.
 {¶ 3} In order to sell the service contracts, an automobile dealership enters into an administrative agreement with appellee Fidelity. Under the administrative agreements, appellee Fidelity initially provides dealerships with the service contract forms. Appellee Fidelity also reviews customer claims and determines whether a repair or replacement should be authorized.
 {¶ 4} Appellee Fidelity and Jim Moran Associates (JMA) are managed by the same management group and the same parent company. Under the administrative agreements, JMA trains automobile dealership employees on sale techniques with respect to the service contracts. The training involves instruction regarding a three step process. The first step involves an interview, the second involves a retail presentation and the third step involves product presentations. Peter Chafetz, Financing and Insurance Specialist at JMA, described the process as follows:
 {¶ 5} ". . . Our process is designed to ask straightforward questions of the customer to determine whether or not a need exists. That's what the interview process is all about.
 {¶ 6} "The retail presentation is simply giving all of the available options to the customer so that they can make a decision based on their particular need. Once a customer makes their decision, if a customer says yes, there's no need to pursue that product. That customer will purchase it.
 {¶ 7} "In the event the customer says no, then there's a process to simply go through a clarification process to identify what the specific objection may be and then to make a presentation to see if the value of that product in the customer's eyes can be built." Deposition of Peter Chafetz at 29. During the product presentation step, the service contract is provided to the customer for review. According to Chafetz, the sales process was developed to ensure that the financing and insurance process [FI] met legal, moral and ethical standards and to give "customers the opportunity to choose the products that they felt were best for them." Id. at 30.
 {¶ 8} As part of the sales technique training, JMA provides dealership employees with written training manuals and engages in role playing with the employees. In addition, dealership employees are given a "Word Track Manual", which Chafetz described as a "collection of preprinted outlines of the interview process, the JMA process, and an assortment of product presentations." Deposition of Peter Chafetz at 84. The Word Track Manual contains outlines of suggested customer interview questions. The following testimony was adduced when Chafetz was questioned about the function of the Word Track Manual:
 {¶ 9} "A. It provided a source of material for the retail FI managers to study, to practice their — to improve their understanding of the process and an understanding of the wording.
 {¶ 10} "Q. And by `the process,' are we talking about the JMA sales process that we identified earlier this morning?
 {¶ 11} "A. That is correct.
 {¶ 12} "Q. And correct me if I'm wrong, . . . the word track manual . . . explicitly lays out and explains what the JMA sales process is and how it's supposed to work?
 {¶ 13} "A. Yes.
 {¶ 14} "Q. And it gives examples and additional information for the FI manager to use in order to understand and implement the JMA sales process on an ongoing or forward basis?
 {¶ 15} "A. Yes.
 {¶ 16} "Q. As well as information and assistance in responding to different issues that might arise while they were implementing the JMA sales process in their daily activities; is that correct?
 {¶ 17} "A. Could you be a bit more specific with that question?
 {¶ 18} "Q. Sure. Let's look at page 503 here which looks to be the appendix. I notice that there were some sections here that talk about the closes, the box close, the factory warranty good enough close. Correct me if I'm wrong, those sections deal with providing the FI manager a consistent manner in which to respond to various barriers that might come up during the sale process in dealing directly with the customer?
 {¶ 19} "A. Yes." That's right. Deposition of Peter Chafetz at 87-88.
 {¶ 20} After training dealership personnel, JMA district managers visit dealerships on a monthly basis to monitor the dealership's activities and to determine whether the dealership financing and insurance employees are utilizing the sales process that they were trained to use. The following is an excerpt from Chafetz's deposition testimony:
 {¶ 21} "Q. What type of information would customarily they have gathered in preparation for that visit?
 {¶ 22} "A. They would be monitoring the numbers as far as how many customers the particular FI manager had seen, what type of product penetrations; in other words, how many products were sold, et cetera. There may be different documents that require signatures, whatever. There may have been specific things that were brought up by the dealer, by a sales manager in the way that things were flowing through the finance and insurance department and they would — because time is an issue, they would be organized and have a list of expectations that they were trying to accomplish.
 {¶ 23} "Q. What is the process that the district managers were required to follow at that time if they determined that a particular dealership was not, as you indicated, using the JMA sales process as their individuals were instructed to do?
 {¶ 24} "A. They would be instructed to make the dealer or the general manager aware of the situation and their up-line managers as well.
 {¶ 25} "Q. I'm sorry? An up-line manager being?
 {¶ 26} "A. The person within Jim Moran Associates, Inc. That they reported directly to. We have a hierarchal sales structure.
 {¶ 27} "Q. They have to talk to the dealer who effectively owns the business, but they also have to tell their boss?
 {¶ 28} "A. Yes. As I mentioned earlier, with eight to fifteen accounts or whatever, the JMA rep is not in the store 24 hours a day throughout the entire month, and our job is to — or the JMA rep's job is to make observations, recommendations and try to ensure that the people understand, A, what to do; B, why it's important to do it. But ultimately, the decision of what the retail finance and insurance manager does is that individual's.
 {¶ 29} "Q. I can understand that they are supposed to determine that the people know what they are supposed to do and how they are supposed to do it, and that the district manager monitors the dealership through these visits to determine whether, in fact, the FI managers and the employees are doing the process.
 {¶ 30} "A. Yes.
 {¶ 31} "Q. And that they report to their own manager in JMA about the results of that. Why is that of importance to the up-line manager, as you called it, to their boss, to know whether the dealership is using these processes or not?
 {¶ 32} "A. In most cases, the dealerships partner with us because of our expertise. They look at us to serve as an extra set of eyes. Ultimately, the dealership — the dealership employees and the finance and insurance managers, they are not employed by JMA. They don't have to listen to us. Our job is to make observations and recommendations are shared with the dealer and/or general manager depending on how the store was run. And then as matter of course, if we identify things good or bad, that information is shared with the up-line managers." Deposition of Peter Chafetz at 97-99.
 {¶ 33} Ricart Automotive was party to an administrative agreement with appellee Fidelity and agreed to market appellee Fidelity's service contracts to its customers, including appellant David Cannon. Bradley Sommerkamp, as a Ricart financing and insurance employee, was trained in the JMA sales process in order to sell service contracts. All of Ricart's finance managers were required by Ricart to go through JMA sales process training. Deposition of Bradley Sommerkamp at 41. According to Sommerkamp, JMA representatives provided Ricart with pamphlets to be used in selling the service contracts to dealership customers. The pamphlets, which showed three levels of coverage (powertrain, silver and gold),[1] were customarily used by Sommerkamp and other finance managers at Ricart when marketing service contracts to customers. According to Sommerkamp, appellee Fidelity suggested that the pamphlets be used in explaining to customers what repairs the service contract covered.
 {¶ 34} The following testimony was adduced when Sommerkamp was questioned about the JMA sales process:
 {¶ 35} "Q. Correct me if I'm wrong, from that answer, the finance managers at Ricart have always been supposed to use the selling techniques and materials that JMA provides for these services, correct?
 {¶ 36} "A. Yes.
 {¶ 37} "Q. And while my question was awkward, as finance director, it's partly your responsibility as well to make sure that those systems and those processes are being applied effectively by your finance managers?
 {¶ 38} "A. Yes, yes.
 {¶ 39} "Q. And are they generally?
 {¶ 40} "A. Absolutely.
 {¶ 41} "Q. To your knowledge, in the time since you've been at Ricart when the JMA Performance Development Center selling techniques and products were made available by Ricart, has the Ricart finance managers always been required to follow those procedures and use those systems?
 {¶ 42} "A. Yes.,
 {¶ 43} "Q. And generally, customarily, has that been done?
 {¶ 44} "A. Yes." Deposition of Bradley Sommerkamp at 47-48.
 {¶ 45} In November of 1999, appellant David Cannon purchased a 1998 Kia Sportage from Ricart for approximately $12,995.00. Appellant went to the Ricart dealership because a friend of his worked there. Before appellant purchased a service contract from Ricart, he reviewed a laminated brochure with Bradley Sommerkamp which listed the three levels of coverage that could be purchased. Appellant scanned the service contract before purchasing the same at a price of $1,291.00, but did not look at every page even though he had as much time as he wanted to read the contract. Appellant's December 19, 2003, Deposition at 44-45.
 {¶ 46} After appellant purchased the Kia Sportage on "an impulse",[2] the transmission went out twice. After his car broke down in Albuquerque, New Mexico, in March of 2001, appellant tried to have the transmission replaced under the service contract. Appellant had the Kia, which had 73,880 miles on it, towed to a dealership where it was determined that the transmission failed due to lack of lubrication. Appellee Fidelity had a used transmission installed at its own expense even though it believed that the repair was not covered by the service contract since the service contract that appellant had purchased specifically excluded mechanical breakdowns caused by lack of lubrication.
 {¶ 47} Appellant's transmission went out a second time in December of 2001. Appellant's father was told that appellee Fidelity was not going to replace the second transmission because it believed the problem was a result of appellant's negligence. Appellee Fidelity denied the claim after its inspector determined that the transmission failure was due, once again, to lack of lubrication due to a transmission leak. As a result, appellant's father paid for the transmission to be replaced at an Aamco at a cost of approximately $2,357.80. Appellant then allowed the Kia to be repossessed.
 {¶ 48} Subsequently, on April 7, 2003, appellant filed a complaint for declaratory, injunctive and damages relief against appellee Fidelity in the Muskingum County Court of Common Pleas. Appellant, in his complaint, argued that appellee had violated the Ohio Consumer Sales Practices Act and the Ohio Corrupt Practices Act. Appellant alleged that appellee Fidelity's standardized service contracts and standardized sales process fraudulently and illegally misrepresented or concealed material facts.[3] Appellant also alleged that he had been fraudulently induced to purchase the service contract, that appellee Fidelity had breached the terms of the service contract and that appellee Fidelity was not licensed to sell insurance in the State of Ohio. Appellant, in his complaint, also moved for class certification.
 {¶ 49} Both appellant's complaint and his supplemental motion to certify sought certification of a class under Civ.R. 23(B)(2) as follows:
 {¶ 50} "all Ohio residents who at any time on or after November 1, 1999 were sold one of defendant's `Mechanical Failure Service Contract for Used Cars' or similar product for or in connection with an automobile primarily used for personal, family, or household purposes."
 {¶ 51} Appellant also asked the trial court to certify the following subclass under Civ. R. 23(B)(3):
 {¶ 52} "all class members who have or will submit a claim(s) thereunder for a covered vehicle(s) during a covered period(s), which claims(s) was denied in whole or part on grounds not disclosed on the face of the writings used during the product presentation step of the JMA sales process."
 {¶ 53} As memorialized in a Judgment Entry filed on May 9, 2005, the trial court denied appellant's request for class certification. The trial court, in its entry, stated, in relevant part, as follows:
 {¶ 54} "In the case at bar, it appears that each member of the proposed class and sub class would suffer different damages and in order to properly represent members of the class and sub class would require an inquiry into each members understanding or lack of understanding of the terms of the contract.
 {¶ 55} "Nothing presented to the Court indicates a very large number for the prospective class and/or sub class. Assuming that the requirements of Rule 23(A) are all met, which the Court does not necessarily conclude, problems exist with Rule 23(B).
 {¶ 56} "It would also be necessary to examine in each potential case the `sales pitch' made to the customer by numerous car dealerships throughout the state. For these reasons, the request for class certification is denied."
 {¶ 57} Appellant now raises the following assignments of error on appeal:
 {¶ 58} "THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING RULE 23(b)(3) CERTIFICATION WITHOUT CONDUCTING A COMPARATIVE ASSESSMENT OF THE SIGNIFICANCE OF COMMON QUESTIONS TO RESOLVING ISSUES OF IMPORTANCE TO THE CASE AS WHOLE, VERSUS THE NECESSITY OF DECIDING INDIVIDUAL QUESTIONS TO RESOLVE THE CENTRAL ISSUES, AS THE RULE 23(b)(3) PREDOMINANCE EVALUATION REQUIRES.
 {¶ 59} "II. THE TRIAL COURT ABUSED ITS DISCRETION SINCE IT DENIED RULE 23(b)(3) CERTIFICATION BASED ON A PLAIN DISREGARD OR IGNORANCE OF WELL-ESTABLISHED LAW AND APPLICATION OF AN INCORRECT, OVERLY STRINGENT LEGAL STANDARD.
 {¶ 60} "III. THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO EXPLICITLY RULE ON THE SATISFACTION, OR NON-SATISFACTION, OF EACH CIV. R. 23 FACTOR."
 I, II, III {¶ 61} Appellant, in his three assignments of error, argues that the trial court erred in denying his request for class certification. Appellant specifically contends that the trial court, in denying his request for class certification, failed to conduct a comparative analysis of individual questions versus common questions and misapplied the law. Appellant further contends that the trial court abused its discretion in failing to "explicitly rule on the satisfaction, or non-satisfaction, of each Civ.R. 23 factor." We disagree.
 {¶ 62} Class certification is governed by Civ. R. 23. Civil Rule 23 states as follows:
 {¶ 63} "(A) Prerequisites to a class action
 {¶ 64} "One or more members of a class may sue . . . as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
 {¶ 65} "(B) Class actions maintainable
 {¶ 66} "An action may be maintained as a class action if the prerequisites of subdivision (A) are satisfied, and in addition:
 {¶ 67} "(1) the prosecution of separate actions by . . . individual members of the class would create a risk of
 {¶ 68} "(a) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class; or
 {¶ 69} "(b) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
 {¶ 70} "(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
 {¶ 71} "(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (d) the difficulties likely to be encountered in the management of a class action."
 {¶ 72} In addition, courts have held that the following are elements not explicitly found in Civ. R. 23, but are required for certification: (1) that the class be identifiable and that the definition of the class be unambiguous; and (2) that the class representative be a member of the class. Shaver v. Standard OilCo. (1990), 68 Ohio App.3d 783, 793, 589 N.E.2d 1348.
 {¶ 73} If a plaintiff fails to prove any one of the prerequisites of Civ. R. 23 or either of the two implicit requirements of Civ. R. 23, class certification should be denied by the trial court. Shaver, supra. A trial court must carefully apply the class action requirements and conduct a rigorous analysis into whether the prerequisites of Civ.R. 23 have been satisfied. Hamilton v. Ohio Sav. Bank, 82 Ohio St.3d 67, 70,694 N.E.2d 442, 1998-Ohio-365. The Ohio Supreme Court inHamilton suggested, but did not mandate, that trial courts make separate written findings as to each of the seven class action requirements under Civ.R. 23, and specify their reasoning as to each finding. Id. at 71, 694 N.E.2d 442.
 {¶ 74} This court's standard of review concerning a trial court's decision whether a class action may be maintained is abuse of discretion. Planned Parenthood Association ofCincinnati, Inc. v. Project Jericho (1990), 52 Ohio St.3d 56,62, 556 N.E.2d 157. In order to find an abuse of discretion, we must determine that the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217,450 N.E.2d 1140.
 {¶ 75} At issue in the case sub judice is whether the trial court correctly denied appellant's request for Civ. R. 23(B)(3) certification. As is stated above, Civ. R. 23(B)(3) states, in part, that an action may be maintained as a class action if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, . . ." In order to establish predominance for purposes of Civ.R. 23(B)(3), "it is not sufficient that common questions merely exist; rather, the common questions must represent a significant aspect of the case and they must be able to be resolved for all members of the class in a single adjudication." Schmidt v. Avco Corp. (1984),15 Ohio St.3d 310, 313, 473 N.E.2d 822. "`[A] claim will meet the predominance requirement when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position.'" Cope v. Metro. LifeIns. Co., 82 Ohio St.3d 426, 429-430, 696 N.E.2d 1001,1998-Ohio-405, quoting Lockwood Motors, Inc. v. Gen. MotorsCorp. (D.Minn. 1995), 162 F.R.D. 569, 580.
 {¶ 76} The Ohio Supreme Court, in Cope, supra, stated, in relevant part, as follows:
 {¶ 77} "As explained in the 1966 Advisory Committee Notes to Fed.R.Civ.P. 23(b)(3): `Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results. * * *
 {¶ 78} `The court is required to find, as a condition of holding that a class action may be maintained under this subdivision, that the questions common to the class predominate over the questions affecting individual members. It is only where this predominance exists that economies can be achieved by means of the class-action device. In this view, a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action. * * * On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was materialvariation in the representations made or in the kinds or degreesof reliance by the persons to whom they were addressed.' (Emphasis added.)
 {¶ 79} `Courts generally find that the existence of common misrepresentations obviates the need to elicit individual testimony as to each element of a fraud or misrepresentation claim, especially where written misrepresentations or omissions are involved. They recognize that when a common fraud is perpetrated on a class of persons, those persons should be able to pursue an avenue of proof that does not focus on questions affecting only individual members. If a fraud was accomplished on a common basis, there is no valid reason why those affected should be foreclosed from proving it on that basis." Id. at 430.
 {¶ 80} As is stated above, a fraud case may not be appropriate for class action treatment if there were material variations in the representations made or with respect to the kind or degree of reliance on such representations. See Cope,
supra. In the case sub judice, we find that the trial court did not abuse its discretion in denying appellant's request for class certification since questions common to the class do not predominate over the questions affecting individual members with respect to the representations made by Fidelity. As is set forth above in the statement of facts, Peter Chafetz testified that the individual dealerships were not required to follow appellee Fidelity's recommendations regarding how service contracts are sold and that appellee Fidelity could not control whether its sales recommendations were followed by each of the 85 dealerships with which it has administrative agreements. Thus, there was no standardized sales process, only a recommendation that the sales process be followed. Therefore, as noted by the trial court, it "would also be necessary to examine in each potential case the `sales pitch' made to the customer by numerous car dealerships throughout the state."
 {¶ 81} Furthermore, unlike in the cases cited by appellant in his brief, there is no common misrepresentation or omission across the entire class. See Cope, supra. In the case sub judice, appellant contends that "the class and subclass claims all contain generalized evidence consisting of Fidelity's standardized service contract forms and the proprietary JMA sales process."
 {¶ 82} In Baughman v. State Farm Mutual Auto Ins. Co.,88 Ohio St.3d 480, 727 N.E.2d 1265, 2000-Ohio-397, the Ohio Supreme Court held that a class should have been certified in a case where a group of policyholders based their claims against an insurer on its use of standard forms and routine procedures, combined with a common omission to inform policyholders that multiple uninsured and underinsured motorist policies in the same household were a waste of money because they could not be stacked. Similarly, the class action in Cope v. Metro. Life Ins.Co., supra, involved standard forms and routine procedures and also a common omission (omitting state-mandated disclosure warnings when issuing replacement life insurance).[4] InCope, the court noted that courts "generally find that a wide variety of claims may be established by common proof in cases involving similar form documents or the use of standardized procedures and practices." Id. at 430. Accordingly, the Ohio Supreme Court held that the trial court had abused its discretion in denying class certification, stating, "Indeed, we cannot imagine a case more suited for class action treatment than this one. This case involves the use of form documents, standardized practices and procedures, common omissions spelled out in written contracts, and allegations of a widespread scheme to circumvent statutory and regulatory disclosure requirements * * *." Id. at 437.
 {¶ 83} In Linn v. Roto-Rooter, Cuyahoga App. No. 82657, 2004-Ohio 2559, the appellee, a customer, brought a class action against Roto-Rooter asserting claims for fraudulent misrepresentation, fraudulent concealment, unjust enrichment and violations of the Ohio Consumer Sales Practices Act based on Roto-Rooter's practice of including a preprinted "miscellaneous supplies charge" on all of its customer invoices, including the appellee's. The trial court granted the appellee's motion for class certification and certified the following class:
 {¶ 84} "All persons and entities who reside in Alabama, Arkansas, and California. . . . and who were charged a miscellaneous supplies charge in connection with services by a Roto-Rooter Company-owned store during the period of October 1, 1999 through July 1, 2002."
 {¶ 85} Roto-Rooter then appealed the class certification. The Eighth District Court of Appeals reversed, holding, in part, as follows:
 {¶ 86} "In finding that common questions of fact predominate, the trial court concluded that the use of the standardized invoices charging all customers the same miscellaneous supplies fee regardless of the actual supplies used was illegal. However, the cases relied on by the trial court do not support this broad notion that the mere use of a standardized form with a pre-printed fee is the basis for liability alone. See, e.g.,Hamilton, supra (undisputed that class members were charged interest rates other than those disclosed in mortgage loan agreements); Cope v. Metropolitan Life Insurance Co. (1988),82 Ohio St.3d 426, 696 N.E.2d 1001 (involved the identical omission of standard disclosure warnings in the written insurance policies of every class member). Rather, these cases recognize that when evidence of a defendant's deceitful or fraudulent conduct is set forth in a standardized contract distributed to many and resulting in class-wide injury, then such a case is ideal for class certification. The crucial difference between those cases and the instant case is that Roto-Rooter's invoice alone does not demonstrate deceit or fraud. Likewise, there is no evidence of class-wide injury." Id. at paragraph 19.
 {¶ 87} Furthermore, in Cobbett v. Human Dev. CounselingAssoc. Inc. (Dec. 23, 1985), Stark App. No. CA-6711, 1985 WL 4712, there was a common omission. In Cobbett, the appellants filed a complaint on behalf of themselves and sought to join in a class action 169 individuals who were alleged to have received psychological services from a woman who was employed by Human Development and Counseling Associates, Inc. The appellants alleged that such woman, was not, as represented, a psychologist, did not have a PhD degree, and was not a doctor. This Court found that individual testimony from each class member was not required since there was misrepresentation common to the entire class. That misrepresentation was that the woman was a psychologist, had a PhD and was a doctor.
 {¶ 88} However, in the case sub judice, there is not an omission or misrepresentation common to the entire class that could be relied upon to prove, or to disprove, the claims of the class. As noted by appellee, "[w]ith the number of dealership employees around the state who have offered the Service Contract to customers, there necessarily will be countless variations in the [sales] presentation." In the case sub judice for example, there is no evidence that there were any high pressure sales tactics used or that any oral misrepresentations were made to appellant. We find, therefore, that the trial court correctly applied the law in determining, in the case sub judice, that individual testimony establishing each class member's evidence of the sales pitch would be required.
 {¶ 89} As is stated above, class certification treatment also may not be appropriate in a fraud case where there are material variations in the kinds or degree of reliance by the persons to whom representations were made. See Cope, supra. The trial court, in the case sub judice, implicitly found that there would be material variations with respect to the kind and degree of reliance in stating that "an inquiry into each members understanding or lack of understanding of the terms of the contract" would be required in this matter. We agree. In the case sub judice, evidence was adduced that appellant had unlimited time to review the service contract, but only scanned the same briefly. In contrast, other potential class members may have read the service contract in its entirety and asked questions about the specified exclusions. Their reliance therefore, could have been different in kind and degree than appellant's. Each individual dealership customer who purchased a service contract may have understood differently the terms of the contract. We concur with both appellee and the trial court that individual facts with respect to a customer's understanding of the terms of the contract and reliance on representations regarding the same predominate over any common issues. In addition, appellant received a benefit under the service contract since appellee Fidelity paid for replacement of one transmission. In contrast, other customers may have received no such benefit.
 {¶ 90} In short, we find that common questions of fact do not predominate and that the trial court properly denied appellant's request for class certification on such basis. We concur with appellee that the claims asserted in this case would require individual inquiry into the representations made to each member and into each member's kind and degree of reliance on the same. Common questions, therefore, do not predominate over questions affecting only individual members.
 {¶ 91} While appellant contends that the trial court abused its discretion in failing to explicitly rule on each of the Civ.R. 23 factors, we note that there is no requirement that the trial court do so. As is stated above, the Ohio Supreme Court inHamilton, supra., suggested, but did not mandate, that trial courts make separate written findings as to each of the seven class action requirements under Civ.R. 23, and specify their reasoning as to each finding. Id. at 71. See also Tammac Corp.v. Norch, Stark App. No. 2002CA00402, 2003-Ohio-2724. Thus, the trial court was not required to address each of the Civ.R. 23 factors and did not abuse its discretion in failing to address the remaining factors after determining that Civ. R. 23(B)(3) had not been met.
 {¶ 92} Based on the foregoing, appellant's three assignments of error are overruled.
 {¶ 93} Accordingly, the judgment of the Muskingum County Court of Common Pleas is affirmed.
By: Edwards, J. Wise, P.J. and Hoffman, J. concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Muskingum County Court of Common Pleas is affirmed. Costs assessed to appellant.
[1] According to Sommerkamp, the "Powertrain had engine, transmission, drive axle listed and the component parts listed next to it. And the silver added to that, . . . And then you go to the Gold and it added more in each category." Deposition of Bradley Sommerkamp at 38.
[2] Appellant's December 23, 2003 Deposition at 31.
[3] We note that appellant does not dispute that Fidelity's service contract contains exclusions from coverage, reservations, and limitations, etc. Rather, appellant argues the exclusions, reservations, and limitations are buried in the back of the service contract and are not conspicuous. Appellant also argues that the standardized sales process employed by Fidelity fails to disclose any of the material exclusions, reservations, limitations, modifications, qualifications, or conditions that Fidelity applies to consumer claims.
[4] The Court, in Cope, noted the Metlife agents targeted existing policy holders, sold them replacement insurance as new insurance, and intentionally omitted the mandated disclosure warning.