[Cite as *Egbert v. Shamrock Towing, Inc.*, 2022-Ohio-474.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Haelie Egbert et al.,                               :

      Plaintiffs-Appellants,                    :

                                    No. 20AP-266

v.                                                  :          (C.P.C. No. 19CV-6391)

Shamrock Towing, Inc.,                              :          (REGULAR CALENDAR)

      Defendant-Appellee.                       :

---

D E C I S I O N

Rendered on February 17, 2022

---

**On brief:** *Hilton Parker L.L.C., Geoffrey C. Parker*, and *Jonathan L. Hilton*, for appellants. **Argued:** *Geoffrey C. Parker.*

**On brief:** *Kemp, Schaeffer & Rowe Co., L.P.A.,* and *Erica Ann Probst*, for appellee. **Argued:** *Erica Ann Probst.*

---

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Plaintiffs-appellants Haelie Egbert, Travis Ellis, and Justin Shanahan (collectively "appellants") appeal an April 20, 2020 opinion of the Franklin County Court of Common Pleas denying appellants' motion for class certification on grounds that the criteria set forth in Civ.R. 23(B)(3) was not met. For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} Appellants filed a class action complaint against defendant-appellee, Shamrock Towing, Inc. ("Shamrock"), for common-law conversion on August 7, 2019, which was amended on September 19, 2019, seeking damages both individually and on behalf of a putative class, arising out of Shamrock's alleged violations of R.C. 4513.601. More specifically, appellants alleged every tow by Shamrock from a purported "private tow-

away zone" was conducted without statutory authorization, at least since the 2015 amendment to R.C. 4513.601 was enacted, because Shamrock's signs fail to create "private tow-away zone[s]." *See* R.C. 4513.601(A). (Am. Compl. at ¶ 5.) Appellants further alleged every tow conducted by Shamrock since 2017, pursuant to Shamrock's "Private Property Impound Authorization Form" ("authorization form"), has also been conducted without statutory authorization due to lack of a written contract with the property owner. *See* R.C. 4513.601(B)(3). (Am. Compl. at ¶ 5.)

{¶ 3} Regarding their claim of conversion, appellants assert they owned, or had the current right of possession of, vehicles that were taken by Shamrock without their consent, and they suffered damages in the form of a "fee" paid to Shamrock to reclaim their vehicles. (Am. Compl. at ¶ 42.) Appellants further assert the taking of appellants' vehicles was wrongful because Shamrock's removal was not authorized by R.C. 4513.601, the statute permitting the creation of a "private tow-away zone," or by any other law. Appellants were deposed by Shamrock and provided the testimony summarized below.

{¶ 4} Ellis testified he parked in the "Fireproof lot" located at 1020 North High Street, Columbus, Ohio on June 28, 2019 and became aware the next morning that his vehicle had been towed. (Ellis Depo. at 17, 24.) Ellis' testimony reflects the Fireproof lot has two entrances and has an L-shape. Ellis testified he could not recall if signs were posted regarding a private tow-away zone when he entered the Fireproof lot to park. Ellis asserted he was given permission to park in the lot from the friend he was visiting who lived in the Fireproof apartments. Ellis further asserted he had previously parked in this same parking space in the Fireproof lot with the permission of employees who worked in the leasing office, however, he did not talk to anyone from the leasing office prior to parking in the Fireproof lot on June 28, 2019. Ellis testified he knew Fireproof owned the lot, that residents of the Fireproof building were assigned spaces for parking, and that the Fireproof lot contained signage indicating resident and customer parking. Ellis also testified the Fireproof lot had designated guest parking, but was not able to recall the wording of the signs. Prior to being towed, and thereafter, Ellis testified he parked, and continued to park, in the same parking space in the Fireproof lot as a guest without being towed. Upon realizing he had been towed, Ellis called the non-emergency police phone number and with

the information provided to him, walked to Shamrock's lot. Ellis paid $156.95 to Shamrock for the tow.

{¶ 5} Egbert's vehicle was towed from a lot located at 45 East Norwich Avenue, Columbus, Ohio on July 23, 2019 (the "Norwich lot"). Egbert testified she moved into an apartment at 45 East Norwich in June 2019, and that the lease she signed made her aware that Oxford Realty owned the property and further that she would need to purchase a parking pass to park in the property's lot. The previous tenant had purchased a parking pass that was left for Egbert, however, Egbert forgot to use the pass on July 23, 2019. Prior to moving in, Egbert purchased a street parking pass and explained through her testimony that the Norwich lot oriented parking spaces in the lot in rows, creating a lot in which vehicles blocked other vehicles, which was how Egbert's car was parked on the day she was towed. Egbert testified she chose to purchase a street permit to park rather than a parking pass for the Norwich lot due to the less than satisfactory design of the parking lot and cost of the pass. When Egbert parked in the Norwich lot on July 23, 2019 she knew she did not have a parking pass for the lot and further that she did not have permission to park in the lot. Egbert acknowledged that a sign was visible when she exited her vehicle after parking on the day in question, and further that she walked by a sign that stated "private tow-away zone unauthorized vehicles will be towed away." (Egbert Depo. at 29.) Egbert recalled the sign posted in the lot stated the cost of the tow was $90.00.[1] Egbert's testimony reflects that the sign posted at the Norwich lot has been modified since she was towed, as the sign now includes an address, whereas an address was not reflected on the sign the day Egbert was towed. (*See* Egbert Depo., Exs. D and F.) Egbert paid $109.65 to Shamrock for the tow.

{¶ 6} Shanahan's vehicle was towed from a lot located at 253 East 19th Avenue, Columbus, Ohio on June 27, 2017. Shanahan was in Columbus on June 27, 2017 for an event and parked at a friend's apartment located at 253 East 19th Avenue. Shanahan parked in his friend's roommate's parking space with the permission of his friend who lived at the property; however, he did not have permission from the property owner. According to Shanahan, his friend's roommate had either a parking pass or sticker, however Shanahan

---

[1] According to testimony from Shamrock, this sign stated the amount of charges applicable to a tow, which is a sign that was used prior to the change made to R.C. 4513.601.

was not provided with either and did not display from his vehicle anything indicating he had authorization to park in the lot. Shanahan acknowledged that when he exited his vehicle after parking in the lot, he was able to observe a sign indicating the property owner with a towing sign underneath but was not able to confirm the signs presented to him via exhibits by Shamrock were the same signs that were posted in the lot on the day he was towed.  Shanahan was able to pick up his vehicle the same day he was towed, and testified he knew where to go from either the phone number on a sign located at the lot or the non-emergency number for police.  Shanahan paid $109.65 to Shamrock for the tow.

{¶ 7} Appellants filed a motion for class certification on January 31, 2020.  In their motion for class certification, appellants defined the proposed class as: "All individuals (1) who owned or had the current right to possess a vehicle, (2) which vehicle Shamrock towed from a purported 'private tow-away zone,' (3) where that tow took place under the purported authority of R.C. 4513.601, and (4) where that tow took place on or after August 7, 2015."  (Mot. for Class Certification at 1.) In addition to the aforementioned proposed class, appellants sought certification of four overlapping subclasses.  Relevant to the issues before this court, appellants' proposed contract subclass was defined as: "All individuals who are members of the proposed Class [sic] and whose vehicles were towed by Shamrock on or after April 6, 2017." (Mot. for Class Certification at 2.)

{¶ 8} On February 28, 2020, the trial court conducted a hearing on appellants' motion for class certification. Counsel presented oral arguments in support of their respective positions related to appellants' motion for class certification.  In addition to oral arguments, the trial court considered deposition testimony by appellants filed February 18, 2020 and deposition testimony from David Timothy Duffy ("Tim") current president of Shamrock, and James Michael Duffy ("Mike") Tim's brother and another employee of Shamrock, filed January 31, 2020.

{¶ 9} During the hearing before the trial court, appellants withdrew their request for three of the proposed subclasses, which was memorialized further in appellants' post-hearing notice filed March 2, 2020.  Appellants' request to certify the proposed class and the remaining proposed contract subclass pursuant to Civ.R. 23(B)(3) remained.

{¶ 10} Appellants' post-hearing notice provided the following definitions for appellants' proposed class and subclass:

> **Proposed Class** (*defined by the 4-year statute of limitations for conversion*):
>
> All individuals (1) who owned or had the current right to possess a vehicle, (2) which vehicle Shamrock towed from a purported "private tow-away zone," (3) where that tow took place under the purported authority of R.C. 4513.601; and (4) where that tow took place on or after August 7, 2015.
>
> **Proposed Contract Subclass** (*defined by effective date of the contract requirement*):
>
> All individuals (1) who owned or had the current right to possess a vehicle, (2) which vehicle Shamrock towed from a purported "private tow-away zone," (3) where that tow took place under the purported authority of R.C. 4513.601; and (4) where that tow took place on or after April 6, 2017.

(Emphasis sic.) (Appellants' Post-Hearing Notice at 1.)

{¶ 11} On April 20, 2020, the trial court denied appellants' motion for class certification finding appellants failed to satisfy the requirements of Civ.R. 23(B)(3). Specifically, the trial court determined the proposed classes were not readily ascertainable, common questions did not predominate over questions affecting only individual members; the existence and/or terms of contracts were not shown to be a common issue that predominates; and because no identifiable class existed, a class action was not a superior way to address appellants' claims.

{¶ 12} It is from the denial of appellants' motion for class certification that appellants appeal.

## II. Assignments of Error

{¶ 13} Appellants appeal and assign the following four assignments of error for our review:

> [I.] The trial court abused its discretion by declining to certify both the proposed Class and the proposed Contract Subclass based on a purported lack of ascertainability.

[II.] The trial court abused its discretion by declining to certify both the proposed Class and the proposed Contract Subclass based on a purported lack of superiority.

[III.] The trial court abused its discretion by declining to certify the proposed Contract Subclass based on a purported lack of predominance.

[IV.] The trial court abused its discretion by declining to certify the proposed overarching Class based on a purported lack of predominance.

## III. Analysis

### A. Standard of Review as to Civ.R. 23 Class Certification

{¶ 14} A trial court has broad discretion in deciding whether a class action may be maintained, and that conclusion will not be disturbed absent a showing of an abuse of discretion. *Marks v. C.P. Chem. Co., Inc.*, 31 Ohio St.3d 200 (1987), syllabus. The term abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1987). In applying this standard, due deference is given the trial court's decision, as it is in the best position to understand its docket management and analyze the inherent complexities that arise from class action litigation. *Marks* at 201. "A finding of abuse of discretion, particularly if the trial court has refused to certify, should be made cautiously." *Frisch's Restaurant, Inc. v. Kielmeyer*, 10th Dist. No. 05AP-412, 2005-Ohio-5426, ¶ 13, quoting *Marks* at 201.

{¶ 15} However, the Supreme Court of Ohio has instructed that a trial court's discretion in deciding whether to certify a class action is not without limits and must be exercised within the framework of Civ.R. 23. *Hamilton v. Ohio Sav. Bank*, 82 Ohio St.3d 67, 70 (1998). The trial court must carefully apply the requirements of Civ.R. 23 and conduct a rigorous analysis into whether those requirements have been satisfied. *Id.* As described by the Supreme Court in *Felix v. Ganley Chevrolet, Inc.*, 145 Ohio St.3d 329, 2015-Ohio-3430, ¶ 26, a trial court's "rigorous analysis" often requires the trial court to "look[] into enmeshed legal and factual issues that are part of the merits of the plaintiff's underlying claims." In determining whether the criteria for Civ.R. 23 class certification has

been met by the plaintiff, a trial court must "consider what will have to be proved at trial and whether those matters can be presented by common proof." *Cullen v. State Farm Mut. Auto. Ins. Co.,* 137 Ohio St.3d 373, 2013-Ohio-4733, ¶ 17, citing 7AA Wright, Miller & Kane, Federal Practice and Procedure, Section 1785 (3d Ed.2005). However, a trial court may only consider the underlying merits of plaintiff's claims only to the extent necessary to determine whether the plaintiff has satisfied the requirements of Civ.R. 23. *Felix* at ¶ 26; *Stammco, L.L.C. v. United Tel. Co. of Ohio,* 136 Ohio St.3d 231, 2013-Ohio-3019, ¶ 44. Although it is the preferred course, Civ.R. 23 does not mandate that the trial court make specific findings on each of the seven prerequisites for class certification, nor that it articulate its reasoning for such findings as part of its rigorous analysis. *Hamilton* at 70-71.

## B. Requirements for Civ.R. 23 Class Certification

{¶ 16} The Supreme Court articulated the following seven prerequisites for certification of a class action pursuant to Civ.R. 23: (1) an identifiable class must exist and the definition of the class must be unambiguous, (2) the named plaintiff representatives must be members of the class, (3) the class must be so numerous that joinder of all the members is impracticable, (4) there must be questions of law or fact common to the class, (5) the claims or defenses of the representatives must be typical of the claims or defenses of the class, (6) the representative parties must fairly and adequately protect the interests of the class, and (7) one of the three requirements for certification set forth in Civ.R. 23(B) must be met. *Hamilton* at 71, citing *Warner v. Waste Mgt., Inc.,* 36 Ohio St.3d 91, 96 (1988); Civ.R. 23. The first two prerequisites are implicitly required while the remaining five are explicitly set forth in the rule. *Warner* at 94.

{¶ 17} The party seeking class action certification pursuant to Civ.R. 23 must prove, by a preponderance of the evidence, that the proposed class meets each of the requirements set forth in the rule. *Id.* The burden of proof is satisfied when all the prerequisites of Civ.R. 23(A) are met and, further, that at least one of the requirements as set forth in Civ.R. 23(B) are met. *Hamilton* at 71.

{¶ 18} Civ.R. 23 states:

(A) Prerequisites.

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> (1) the class is so numerous that joinder of all members is impracticable,
>
> (2) there are questions of law or fact common to the class,
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and class,
>
> (4) the representative parties will fairly and adequately protect the interests of the class.
>
> (B) Types of class actions.
>
> A class action may be maintained Civ.R. 23(A) is satisfied [sic], and if:
>
> * * *
>
> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> (a) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (b) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (d) the likely difficulties in managing a class action.

## C. Criteria of Predominance per Civ.R. 23(B)(3) – Fourth and Third Assignments of Error

{¶ 19} Here, appellants sought certification of their proposed class and proposed contract subclass under Civ.R. 23(B)(3).

{¶ 20} The first requirement for maintaining a class action under Civ.R. 23(B)(3) provides that common questions of law or fact predominate over questions concerning only individual members of the class. *Assn. for Hosps. & Health Sys. v. Ohio Dept. of Adm. Servs.*, 10th Dist. No. 04AP-762, 2006-Ohio-67, ¶ 25. And therefore "a key purpose of the predominance requirement is to test whether the proposed class is sufficiently cohesive to warrant adjudication by representation." *Felix* at ¶ 35, citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997).

{¶ 21} For common questions of law or fact to predominate, it is not sufficient that such questions merely exist; rather, they must also represent a significant aspect of the case and they must be capable of resolution for all members in a single adjudication. *Marks* at 204. " ' "To meet the predominance requirement, a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof." ' " *Cullen* at ¶ 30, quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 544 (6th Cir.2012), quoting *Randleman v. Fidelity Natl. Title Ins. Co.*, 646 F.3d 347, 352-53 (6th Cir.2011).

{¶ 22} Appellants' third and fourth assignments of error argue the trial court abused its discretion by declining to certify appellants' proposed class and subclass based on a purported lack of predominance. We will begin by discussing appellants' fourth assignment of error regarding appellants' proposed class, which is the main class, and thereafter we will discuss appellants' proposed contract subclass as addressed in appellants' third assignment of error. Both assignments of error address R.C. 4513.601 which appellants refer to as a "safe harbor" for appellee.

### 1. Fourth Assignment of Error

{¶ 23} In their fourth assignment of error, appellants argue the trial court abused its discretion by declining to certify their proposed class based on a purported lack of predominance.

{¶ 24} In support, appellants raise the following issues: (1) R.C. 4513.601's safe harbor is an affirmative defense for which Shamrock bears the burden of proof, and (2) at the class certification stage, Shamrock must present evidence that an affirmative defense applies to a significant percentage of the proposed class.

{¶ 25} As to the first issue raised by appellants in support of their fourth assignment of error, appellants argue that Shamrock bears the burden to produce evidence as an affirmative defense that Shamrock conducted tows in accord with R.C. 4513.601.[2] Appellants aver this burden shift is appropriate because often the tow company will have actual knowledge of, and ability to prove, contents of the signage on the relevant lot at the time of the tow; and further, that Shamrock is better situated to bring forth evidence as to the contents of the signs on the lots from which it has conducted tows. Appellants cite R.C. 4513.601(D)(1) in support of their proposition.

{¶ 26} In its decision denying appellants' motion for class certification, the trial court found Shamrock did not bear the burden of proof to raise an affirmative defense as to liability because appellants' argument was not supported by Ohio law. In addition to the trial court's finding, the trial court considered, assuming arguendo, that if Shamrock was required to present proof of an affirmative defense, the difficulties meeting predominance remained. *See* Civ.R. 23(B)(3). The trial court stated that important, individualized issues with R.C. 4513.601(A)(1) impact this case. More specifically, the trial court noted "the

---

[2] In support of their argument, appellants cite this court's decision in *Bugoni v. C & M Towing*, 10th Dist. No. 12AP-62, 2012-Ohio-4508. However, the posture of the case in *Bugoni* and in the case before us differ. In *Bugoni*, the issue before this court was whether the trial court abused its discretion by granting the appellee's Civ.R. 12(B) motion to dismiss for the appellant's failure to state a claim. *Id.* at ¶ 3. The appellant's underlying cause of action was a complaint alleging conversion of his personal vehicle when the appellee towed his vehicle without his consent. *Id.* at ¶ 9. Citing to the former version of the private tow-away zone statute, R.C. 4513.60(B), the appellee argued the claim of conversion failed because the appellant parked his vehicle in a marked private tow-away zone. *Id.* at ¶ 10. This court held because the complaint did not contain allegations related to R.C. 4513.60(B), the appellee's argument was not a basis on which the trial court could grant a motion to dismiss for failure to state a claim. *Id.* This court further stated, because the appellant stated a claim for conversion, the trial court abused its discretion by dismissing the appellant's complaint for failure to state a claim. *Id.* at ¶ 11.

In further support, appellants also cite *Stanley v. Auto Tow & Bradley Motors*, 9th Dist. No. 92CA005441 (Feb. 17, 1993). In *Stanley*, the appellant filed a complaint against Auto Tow & Bradley Motors ("Auto Tow") alleging conversion of his vehicle and Auto Tow raised, as an affirmative defense pursuant to R.C. 4513.60, the former version of the private tow-away zone statute. The Ninth District affirmed the trial court's finding that at one time the appellant was authorized as a tenant to park in the apartment complex and that Auto Tow failed to prove that the property owner had notified the appellant that he was no longer permitted to park in the lot in question or that the appellant parked in violation of the posted conditions, therefore Auto Tow did not have authority to hold the appellant's truck until tow and storage charges were paid. *Id.*

Because the authority cited by appellants does not address class certification, and more specifically, the issue of predominance, we do not find the argument as presented by appellants to apply to the matter before us. We also agree with the trial court that, assuming arguendo, appellants are correct that the obligation to show signage as to each tow is an affirmative defense, that would still not avoid the need for individual trials.

legality of each tow based upon signs posted in individual lots on specific dates – is highly individualized." (Opinion at 8.) In finding appellants did not meet the predominance requirement, the trial court denied certification of the proposed class because common questions as required by Civ.R. 23(B)(3) were not met. The trial court's analysis pointed to the need to examine questions about the location from which each proposed class member was towed in addition to examination of the specific signage present on the relevant day from each tow location for the thousands of tows of the purported class which would require "[m]ini-trials, focused on each tow from each lot, with a specific determination of the signage present when Shamrock towed a vehicle, would be essential to determine whether vehicles actually were illegally towed or wrongfully converted." (Fn. omitted; Opinion at 15-16.)

{¶ 27} Appellants' arguments asserting Shamrock bears the burden to prove an affirmative defense disregards the inquiry as to whether appellants' proposed class has met the requirement of predominance. This is likewise true with respect to appellants' second argument in support of their fourth assignment of error, wherein appellants assert Shamrock must present evidence that the affirmative defense applies to a significant percentage of the proposed class.

{¶ 28} Appellants further support their fourth assignment of error that the trial court abused its discretion when it found a lack of predominance as to the proposed class, by arguing that the trial court: (1) accepted bald legal conclusions over evidence in the record, or (2) incorrectly interpreted a statute not before it.

{¶ 29} Specifically, as to the first argument, appellants assert the trial court's finding that "[b]ased upon the testimony by Shamrock witnesses currently of record, proper signs were in place containing appropriate 'legal' language for at least some tows and some locations," is a bald assertion only supported by Shamrock witnesses. (Appellants' Am. Brief at 59-60; Opinion at 16.)

{¶ 30} Appellants contend Shamrock's signs do not contain all the language set forth in R.C. 4513.601(A)(1), therefore there is not a single sign on any lot from which Shamrock conducted a tow on a member of the proposed class that has been in compliance with R.C. 4513.601. In making this argument, appellants interpret R.C. 4513.601 to require all

language set forth in R.C. 4513.601(A)(1) must be contained in one sign. Pointing to the record, appellants claim Shamrock's signs do not contain a "description of persons authorized to park on the property." R.C. 4513.601(A)(1)(b). Appellants support their claim by referring to testimony presented by Shamrock that states Shamrock adds addresses of the property to Shamrock's standard signs. Ultimately, appellants contend that if their interpretation of the statute is correct, then none of Shamrock's signs comply.[3]

{¶ 31} Under R.C. 4513.601(A), "[t]he owner of a private property may establish a private tow-away zone, but may do so only if all of the following conditions are satisfied":

> (1) The owner of the private property posts on the property a sign, that is at least eighteen inches by twenty-four inches in size, that is visible from all entrances to the property, and that includes all of the following information:
>
> (a) A statement that the property is a tow-away zone;
>
> (b) A description of persons authorized to park on the property. If the property is a residential property, the owner of the private property may include on the sign a statement that only tenants and guests may park in the private tow-away zone, subject to the terms of the property owner. If the property is a commercial property, the owner of the private property may include on the sign a statement that only customers may park in the private tow-away zone. In all cases, if it is not apparent which persons may park in the private tow-away zone, the owner of the private property shall include on the sign the address of the property on which the private tow-away zone is located or the name of the business that is located on the property designated as a private tow-away zone[;]
>
> (c) If the private tow-away zone is not enforceable at all times, the times during which the parking restrictions are enforced;

---

[3] However, as asserted before the trial court, appellants believe one question will resolve the legal issue of the proposed class, "[i]f it is necessary for the signage to be copies of a single sign that includes all of the information required under the statute, then that is sufficient, because Shamrock has no evidence that has ever occurred for any class member." (Feb. 28, 2020 Tr. at 17; Opinion at 14.) Appellants argument asked for consideration of the plain language of the statute as to provision (A) in R.C. 4513.601. R.C. 4513.601(A) explicitly provides for the way in which a *property owner* may establish a private tow-away zone.

> (d) The telephone number and the address of the place from which a towed vehicle may be recovered at any time during the day or night;
>
> (e) A statement that the failure to recover a towed vehicle may result in the loss of title to the vehicle as provided in division (B) of section 4505.101 of the Revised Code.
>
> In order to comply with the requirements of division (A)(1) of this section, the owner of a private property may modify an existing sign by affixing to the existing sign stickers or an addendum in lieu of replacing the sign.

{¶ 32} Tim Duffy testified he is the current president of Shamrock and that he took over the family towing business from his father 30 years ago. Tim estimated Shamrock currently has 6,000 accounts and he further estimated the total number of lots within each account to be 10,000. Tim opined Shamrock tows approximately 12,000 vehicles per year; one-third of that total, around 4,000, consists of tows from private tow-away zones. Shamrock offers towing service on a patrol basis or on-demand. Drivers of the tow trucks conduct patrols of the lots as initiated by the property owner.

{¶ 33} Mike Duffy testified that his current job title could be "[t]he sign man," and he does a bit of everything at Shamrock. (Mike Duffy Depo. at 10.) According to the testimony given by Tim and Mike, Shamrock has its own standard signs printed by a supplier, which Shamrock provides to property owners. Further testimony reflects the appearance of the signs may be customized depending on the needs of the specific property and it is unknown how many signs currently in use have been customized. Shamrock has used two to three versions of signs over the past 20 years. Mike explained that although property owners generally use the signs provided by Shamrock, some property owners post signs that are purchased from print shops in Columbus, Ohio. Mike did not know how many current property owners employing Shamrock's towing services use signs printed by other vendors.

{¶ 34} Mike testified that Shamrock's current sign utilizes language from parameters given by the Towing and Recovery Association, however, the appearance of the signs can be customized at the request of a property owner. The language exhibited on Shamrock's signs reflects:

PRIVATE
TOW-AWAY ZONE
UNAUTHORIZED VEHICLES
WILL BE TOWED AWAY.
PUCO 138816T
CALL NUMBER BELOW FOR LOCATION &
IMPOUND FEES. FAILURE TO RECOVER
A TOWED VEHICLE MAY RESULT IN THE
LOSS OF TITLE TO VEHICLE.
ORC 4505.101
TOWING ENFORCED 24/7


1145 HAMLET ST., COLS., OH 43201
6333 FROST RD., WESTERVILLE, OH 43082
ORC 4513.60 [sic]

(Mike Duffy Depo., Ex. C; Tim Duffy Depo., Ex. C.)

{¶ 35} Both Tim and Mike acknowledged a change in the private towing law that resulted in changes as to what appears on Shamrock's signs, reflected above. Specifically, language was added to the sign in 2015 that provided notice that failure to recover a towed vehicle may result in loss of title, in addition to noting the Public Utilities Commission of Ohio ("PUCO") number. Although updating signs began immediately after the change in the law, not all lots were updated in the same manner. Mike testified lots with heavy traffic, for example lots located on campus, were updated first, otherwise Mike would update signs himself when he happened on an outdated sign or on notification received from tow truck drivers or property owners. As for updated signs that do not reflect who is permitted to park in the lot or who owns the lot, Mike also updates those signs using either a sticker or paint pen.[4] Mike did not know how many signs have been updated since August 7, 2019, the date on which appellants filed a cause of action against Shamrock.

{¶ 36} Tim testified that at the time a vehicle is to be towed, Shamrock employees are instructed to take a photograph of only Shamrock's signs. Shamrock's policy regarding

---

[4] Mike testified: "Well, to put the -- if the owner wasn't going to put the address on there or put their sticker or their logo or whatever in there or any instructions, then if it was an open kind of a lot that wasn't apparent who could park there, or it was a parking lot belonged [sic] to them, then I put the address on there." (Mike Duffy Depo. at 37.)

retention of those photographs was unclear. Shamrock had retained photographs of Egbert's vehicle at the time it was towed from the lot located at 45 East Norwich, which were introduced during the deposition of Tim. A photograph of what is purported to be Shamrock's sign was also introduced; however, the sign was difficult to decipher as photographed. Shamrock also retained photographs of Ellis' vehicle on the day it was towed by Shamrock from the Fireproof lot. Evidence was not provided of Shamrock's sign on the day Ellis' vehicle was towed. The photograph Shamrock did provide of its sign from the Fireproof lot was a photograph of the alley that adjoins the parking lot, however, Tim testified he did not think that the signs depicted in the photograph were the same signs that were posted on the day Ellis' vehicle was towed. Shamrock did not have photographs of Shanahan's vehicle on the day his vehicle was towed from 253 East 19th Avenue or photographs of Shamrock's sign on the day of the tow. However, photographs of the signs located at 253 East 19th Avenue were introduced and Tim testified that the first sign was an older version of a Shamrock sign and the second was Shamrock's sign taken several months after appellants filed their cause of action. Tim testified that the sign in the second picture had an orange overlay, but he did not know what it was. Mike testified that the orange overlay was a sticker he uses to update the signs. (*See* Mike Duffy Depo. at 37.) Tim did not know when the sign had been altered, however, he testified he had been told this particular property owner(s) had been in the process of updating signs themselves. Appellants represented on the record, without objection, that the overlay stated "permit only, 253 East 10th [sic]." (Tim Duffy Depo. at 82.)

{¶ 37} Mike testified that he installs Shamrock's signs according to the wishes of the property owner or at his discretion if the property owner has not stated a designation; however, signs will be posted where the sign is deemed to be visible from all entrances. Property owners are responsible for the installation of a pole if one is not in existence. Mike testified there are times property owners will move signs or add signs near to Shamrock's and Shamrock is not made aware of these changes. Further, Tim agreed there is not a lot in Franklin County that is identical to another lot, each lot has a different view from the entrance, and further, the number of entrances for a lot can vary from one to potentially three.

{¶ 38} In asserting that the trial court relied on bald legal conclusions, appellants maintain the record contains adequate evidence for the court to make an affirmative finding that it is more likely than not that no such sign has been in compliance with R.C. 4513.601(A), which appellants disclaim is their burden to prove. However, appellants' specific argument as to one of the trial court's findings regarding the purported legality of Shamrock's signs overlooks the larger question when assessing the requirement of predominance on the facts of this case.

{¶ 39} When reviewing the record, we must bear in mind that in order to meet the predominance requirement, appellants' claims must be substantiated by generalized proof applicable to the class as a whole that predominates over those issues that are subject to only individualized proof. *See Cullen* at ¶ 30.

{¶ 40} Appellants' proposed class was presented in simple terms, specifically, appellants defined the proposed class as "everyone towed by Shamrock under the authority of the statute, and they all share the claim that there were no comply[ing] signs." (Feb. 28, 2020 Tr. at 26-27.) The trial court clarified, "[t]hat's the essence of it, no compliance [sic] signs." (Tr. at 27.) Appellants answered, "[c]orrect." (Tr. at 27.) The proposed class appellants seek to certify is to be established as of August 7, 2015. In accord with R.C. 4513.601(A)(1), the following must be evaluated as to whether the lot has been established as a private tow-away zone: (1) the size of the sign, (2) the location of the lot from which their vehicle was towed, (3) the location of the signage posted at or in the lot, (4) the content posted on the signage, and (5) whether it was apparent to the person parking the vehicle who was permitted to park in the lot.

{¶ 41} As of the date of testimony provided by Tim, Shamrock tows from 10,000 lots per year and tows approximately 4,000 vehicles per year from private tow-away zones. Tim acknowledged that the lots in Franklin County are not identical to the others, the number of entrances to a lot can vary from one to three, and the view from each lot varies.

{¶ 42} Testimony given by Ellis, Egbert, and Shanahan establish that appellants' recollection lacks detail of the signs posted at the lot on the day their own vehicles were towed and regarding the lot itself; and further their testimony reveals it would be unlikely that class members would be able to provide details regarding any lot other than the one

from which they were towed. Egbert testified she used to live near 253 East 19th Avenue, the lot from which Shanahan was towed, however she could not recall the parking lot. Egbert was familiar with the Fireproof lot, the lot from which Ellis was towed, and she testified she was aware the lot had signs, but she believed the signs gave indication the lot was a shopping complex. Shanahan testified he was not familiar with the lots from which Egbert and Ellis' vehicles were towed. Ellis was not asked questions regarding his familiarity with any lots.

{¶ 43} Whether a sign provides a description of persons authorized to park on the property also requires individualized evaluation. R.C. 4513.601(A)(1)(b) states: "In all cases, if it is not apparent which persons may park in the private tow-away zone, the owner of the private property shall include on the sign the address of the property on which the private tow-away zone is located or the name of the business that is located on the property designated as a private tow-away zone."

{¶ 44} In 2015, Shamrock began the process of updating its signs to comply with a change in the law, however there is no record of what signs were updated and when. Testimony provided by Mike reflects that signs are updated by a full replacement of the sign, by a sticker or with a paint pen. The record also reflects that Shamrock believed one of the property owners of a lot from which an appellant was towed was in the process of making changes to its signs.

{¶ 45} According to the numbers provided by Shamrock, appellants' proposed class could include 4,000 members. Here, appellants presented testimony from three lots and each lot presents its own set of facts. Ellis believed he was permitted to park in the Fireproof lot and further that the Fireproof lot contained signs permitting guests, but he could not recall the wording. Photographs of Ellis' vehicle at the time of tow are in evidence, however photographs of the signs present on the day his vehicle was towed were not. When Egbert parked her vehicle, she knew she was not authorized to park her vehicle in the lot from which she was towed and testified that a sign was visible when she parked her car that stated the lot was a private towing zone and unauthorized vehicles would be towed. Evidence presented regarding signs posted in the lot from which Egbert was towed reflect that signs had been changed since the tow occurred. Shanahan testified he observed two signs when

he parked, one sign providing the name of the property owner and underneath a towing sign, however when presented with photographs purporting to depict signs posted at the lot in question, Shanahan could not confirm the photographs depicted the same signs as the day he was towed.

{¶ 46} As we noted above, "[f]or common questions of law or fact to predominate, it is not sufficient that such questions merely exist; rather, they must present a significant aspect of the case. Furthermore, they must be capable of resolution for all members in a single adjudication." *Cullen* at ¶ 30, quoting *Marks* at 204. " ' "To meet the predominance requirement, a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof." ' " *Id.*, quoting *Young* at 544, quoting *Randleman* at 352-53, citing *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir.2007). Here, the record contains evidence that generalized proof cannot be applied in evaluating each tow conducted by Shamrock for each member of the proposed class; the location of the lot, where signage was posted on the day of the tow, the location of the vehicle prior to tow, what language was stated on the signage on the day of the tow, and the driver of the vehicle's understanding of who was authorized to park in the lot. *See* R.C. 4513.601(A)(1). Therefore, the trial court did not abuse its discretion in finding that individual questions of law and fact predominate over any commonalities of the proposed class.

{¶ 47} Although appellants assert the trial court relied on bald legal conclusions over record evidence to the contrary, we find that review of the record reflects individual questions overwhelm those questions common to the class.[5]

---

[5] Issues regarding class certification of towed vehicles have been addressed by Ohio courts, and as illustrated by caselaw cited by *Shamrock*, the First District found with regard to tows conducted from Central Parking lots "[f]our mini-trials would be necessary to determine whether any and how many parking violations had occurred." *Safi v. Cent. Parking Sys. Ohio, Inc.*, 1st Dist. No. C-150021, 2015-Ohio-5274, ¶ 35. The court declined to certify the proposed class holding, tort and equitable claims involving varying fact patterns along with defenses and damages result in the predominance of individual issues, rather than common. *Id.*

{¶ 48} Second, in addition to asserting the trial court relied on bald legal conclusions, appellants further support their fourth assignment of error by arguing the trial court incorrectly interpreted a statute when the question was not before the trial court. Specifically, whether the trial court improperly resolved a question of law on the merits in finding that the statutory requirement that signs must describe the persons authorized to park can be satisfied by the addition of the address of the lot on which the private tow-away zone is located.

{¶ 49} This court recognized at the class certification stage, a trial court must not determine questions as to the merits outside the parameters of the certification determination; to do so would be an abuse of discretion. *Assn. for Hosps. & Health Sys.* at ¶ 26. "A court may examine the underlying claims only for the purpose of determining whether common questions exist and predominate and not for the purpose of determining the validity of such claims." *Id.*, citing *George v. Ohio Dept. of Human Servs.*, 145 Ohio App.3d 681, 687 (10th Dist.2001).

{¶ 50} Appellants' arguments in support of their fourth assignment of error assert the record reflects adequate evidence for the trial court to find no sign erected by Shamrock on any lot complied with R.C. 4513.601(A). Review of the trial court's decision does not reflect that this finding was made as a determination of the validity of appellants' claims. As discussed above, the trial court's consideration was part of the trial court's analysis as to the predominance requirement, specifically whether a common question existed. Therefore, we cannot find based on our review of the record that the trial court considered the merits outside of what common questions of law or fact predominate as to appellants' proposed class.

---

Shamrock also cites *Carlin v. Genie of Fairview Park*, 8th Dist. No. 48593 (Apr. 11, 1985), wherein the court found parking and towing were a basic nucleus of fact and law for the proposed class under Civ.R. 23(A)(2), however the court further held that the alleged offense of illegally parking on private property over an extended period of time would likely result in claims and defenses that would not be typical across the class in that "the nature of the case, serves to emphasize the differences among the claims of each class member." *Carlin.* In a footnote, the court further explained the nucleus of operative fact through an example of a class alleging breach of a printed contract and where each member's claim was based on the same printed contract, the nucleus of operative fact was the printed contract. *Id.* at fn. 3, citing *Hitzler v. Doraty Chevrolet*, 8th Dist. No. 46035 (Sept. 9, 1983).

{¶ 51} Therefore, we find the trial court did not abuse its discretion in finding the predominance requirement was not met as to appellants' proposed class.

{¶ 52} Accordingly, we overrule appellants' fourth assignment of error.

## 2. Third Assignment of Error

{¶ 53} In their third assignment of error, appellants argue the trial court abused its discretion by declining to certify the proposed contract subclass based on a lack of predominance. Relevant to appellants' proposed contract subclass, R.C. 4513.601(B)(3) states: "No towing service shall remove a vehicle from a private tow-away zone except pursuant to a *written contract* for the removal of vehicles entered into with the owner of the private property on which the private tow-away zone is located." (Emphasis added.) The amended complaint alleges that the authorization form which Shamrock has lot owners sign is not a written contract.

{¶ 54} Appellants allege the trial court gave "short shrift" to appellants' proposed contract subclass and with its five sentence analysis abused its discretion by declining to certify the proposed contract class. (Appellants' Am. Brief at 36.) (*See* Opinion at 17.)

{¶ 55} The trial court found:

> There is another statutory obligation, namely that the towing service removes vehicles only "pursuant to a written contract * * * with the owner of the private property on which the private tow-away zone is located." R.C. 4513.601(B)(3). Plaintiffs' post-hearing filing proposed a "Contract Subclass" focused not on lot signs, but on whether Shamrock operates under "a written contract for the removal of vehicles entered into with the owner of the private property on which the private tow-away zone is located."[6] It is unsettled in the law whether this statute creates a private cause of action in favor of a person whose vehicle is towed from a lot lacking a written contract. Reaching that conclusion essentially requires a determination that a vehicle owner is a third-party beneficiary of the statute. Aside from the need to consider common law

---

[6] The first two sentences of the trial court's analysis are not relevant to the matter before us; however, we will address appellants' arguments regarding the same. Appellants acknowledge the first sentence of the trial court's analysis is correct, however, appellants perceive that the trial court's second sentence suggests appellants first introduced their proposed contract subclass in the post-hearing notice filed by appellants on March 2, 2020. Although we do not find the trial court's second sentence to state what appellants perceive, we do agree that the proposed contract subclass was included in appellants' motion for class certification filed January 31, 2020, but note that the definition of the proposed contract subclass is defined in greater detail by appellants' post-hearing notice. (*Compare* Mot. for Class Certification at 2; Post-Hearing Notice at 1.)

> rules on third-party beneficiary status, it may be relevant here that another Ohio statute lists a dozen or more "major" and "minor" violations of law for which a civil action can be brought against a towing service, but does not list the absence of a written contract as a basis for such a civil claim. R.C. 4513.611. But, as with the signage issue, the existence and/or terms of contracts on some 10,000 lots from which Shamrock may make tows has not been shown to be a common issue that predominates under Rule 23(B)(3).

(Opinion at 17.)

{¶ 56} Appellants argue the trial court improperly considered the merits of appellants' claims as they relate to the proposed contract subclass in the third, fourth, and fifth sentences. More specifically, appellants assert the trial court considered whether appellants have a private right of action under R.C. 4513.601(B)(3), without linking its consideration to the predominance requirement.

{¶ 57} The Supreme Court has held a trial court's rigorous analysis in determining whether Civ.R. 23 has been met often considers enmeshed legal and factual issues, however, the merits of the underlying cause of action may only be examined in determining whether Civ.R. 23 has been met. *Felix* at ¶ 26.

{¶ 58} On review of the three sentences at issue in appellants' argument, we find the trial court's statements to reflect a process of thought by the court rather than dispositive findings. Furthermore, the trial court's statements do not reflect any determination on the merits. Most importantly, the last sentence of the trial court's analysis, finding the existence and/or terms of contracts on some 10,000 lots has not been shown to be a common issue that predominates, leads us to find the trial court did not base its decision on its consideration of the merits of appellants' claims. Because we find the trial court's decision was not based on its consideration of the merits, we do not find appellants' argument compelling. Therefore, we decline to further address appellants' arguments as to the merits of whether the statute creates a private right of action.

{¶ 59} Appellants also argue that the trial court abused its discretion in finding a lack of predominance as to the proposed contract subclass. Specifically, appellants argue the trial court's finding is not supported by the record and is contrary to Ohio Supreme Court precedent. Underlying these arguments is appellants' assertion that a document

which disclaims an intent to bind and or lacks consideration cannot constitute a written contract.

{¶ 60} Regarding the argument that the trial court's finding is not supported by the record, appellants argue the record supports that Shamrock property owners sign an authorization form prior to Shamrock towing from the property owner's lot and that the authorization forms do not materially differ from previous versions. Appellants argue that all versions of the authorization form disclaim any intent to bind, and further, do not purport to create any obligation by Shamrock to the property owner or require consideration on the part of Shamrock. Appellants further argue Shamrock does not permit property owners to modify the authorization form other than listing properties of the property owner from which Shamrock is to tow. Appellants contend the authorization form does not create any obligation on Shamrock's part to perform a tow. Appellants also infer from the record that the authorization forms presented govern nearly all of Shamrock's tows during the subclass period.

{¶ 61} The authorization forms for the tows conducted on the named appellants are found in the record. Each form includes the following statement: "NOTICE: This form serves only to provide Shamrock Towing, Inc. with written authorization to remove vehicles per your instructions in accordance with Ohio Revised Code §4513.60 from properties owned by you or your employer. It is NOT a binding contract of any sort." (Emphasis sic.) (Tim Duffy Depo., Ex. D.)

{¶ 62} Tim testified that Shamrock sends an authorization form to all potential customers. The authorization forms introduced in the record are all entitled the same, "Private Property Impound Authorization Form." Tim testified the authorization form has been used by Shamrock for about ten years and he believes most current property owners have signed Shamrock's newest form. The authorization form requires the signature of either the property owner or property manager, in addition to their respective address and phone number. A signed authorization form is required from every property owner before Shamrock will conduct a tow and authorization forms are retained by Shamrock either on paper or electronically. Shamrock does not charge property owners to tow from lots.

{¶ 63}   The authorization form includes blank lines that require the name of the business or property owner to be inserted, with language stating that the business or property owner authorizes Shamrock to remove vehicles "**PER MY INSTRUCTIONS** from the properties listed below."  (Emphasis sic.) (Tim Duffy Depo., Ex. A.)  Tim testified that instructions from the business or property owner are written into the authorization form and are included as part of the agreement with Shamrock.  Tim also testified that Shamrock's policy does not allow property owners to modify the authorization form.  The record is not clear as to what would be considered a permissible instruction as opposed to an impermissible modification.

{¶ 64} Additionally, the authorization form allows property owners to select the following towing instructions: (1) at the discretion of the property owner using a Shamrock issued authorization code, (2) on a patrol basis removing vehicles parked without a displayed parking permit,[7] and (3) on a patrol basis according to criteria set by the property manager to be coordinated with Shamrock's office.   Each selection has an open field for which the property owner may choose, presumably property owners may choose any or all available towing instructions.

{¶ 65} Tim further testified for those lots from which Shamrock has contracted to patrol, patrolling of lots is initiated by the property owner generally when an issue arises with parking in their lot, resulting in Shamrock increasing patrols of the lot.  Shamrock monitors these patrols with GPS so that reports can be made to the property owners.  Shamrock will discontinue regular patrols of the lot once the issues for which the property owner was concerned are no longer evident.  Shamrock does not regularly patrol all lots on a daily, weekly or monthly basis.  Tim testified that Shamrock always asks the property owner why a tow has been requested; explaining that the circumstances of the vehicle may have changed since the property owner requested the tow and this would require the property owner to decide whether a tow is still requested. Shamrock's initial response to a new lot involves a grace period of about 72 hours for Shamrock to set up in a lot.  Shamrock

---

[7] The towing instructions further state the property owner shall provide a copy of the parking permit to Shamrock's office.

does not guarantee a response time to a tow, as Tim explained the response depends on Shamrock's workload, however industry custom is usually within a few days.

{¶ 66} The authorization form also contains dedicated blank lines for property owners to list properties from which Shamrock is authorized to tow. Tim explained that in addition to the authorization form, Shamrock maintains a code card for each property owner and on that card Shamrock lists names of the properties the property owner has authorized Shamrock to tow. Tim further explained property owner names and their properties may also be entered into Shamrock's computer system if the property list does not fit on the code card.

{¶ 67} While in deposition, appellants pointed out to Tim that Shamrock's authorization form states it is not a binding contract. Tim testified that if a property owner asked if the authorization form was a contract, Shamrock would respond: "[I]f this doesn't work for you, then we won't work for you." (Tim Duffy Depo. at 44.) Appellants inquired further, "Okay. But if somebody asks -- or if somebody says, I don't want to sign a contract, this isn't a contract, right, is the answer?" (Tim Duffy Depo. at 45.) Tim did not have an answer. However, Tim also testified that Shamrock has experienced some potential customers back out because they did not want to sign a contract.

{¶ 68} Tim estimated Shamrock currently has 6,000 accounts and that the total number of lots within each account is estimated to be 10,000. In 2018, approximately 100 new property owners signed an authorization form with Shamrock. Within the parameters of the authorization form, property owners are provided room to give instructions specific to their properties and also in accord with how the property owner wishes their lot to have tows conducted. In addition, property owners may choose any or all of the towing selections delineated on the form. Not all property owners have signed Shamrock's authorization form for the same service and each property owner would necessarily have properties that vary from other property owners who also sign the authorization form for towing services by Shamrock. Shamrock will not conduct tows from a property owner's lot

without a signature on the authorization form, and Shamrock does not exchange money with a property owner for tow services conducted.[8]

{¶ 69} On review of appellants' assertions with the record, we find that although the authorization form begins as a standardized form, the information with which the authorization form is completed creates a document that is individualized for each property owner. The authorization form explicitly permits a property owner to authorize Shamrock to tow pursuant to instructions as provided by the property owner, which according to testimony given by Tim, may be written into the authorization form and is included as part of the agreement. Therefore, we cannot conclude that a property owner cannot modify the authorization form. As the trial court suggests, we question whether the language to which appellants point in the authorization forms has the legal significance in this context to provide a relevant point of commonality sufficient to sustain a class. And if it might, and somehow could be said to relate to a cognizable claim around which a class theoretically could form, then the variations in those agreements that the record reflects would become material and undermine the agreements' value as a means for defining a subclass.

{¶ 70} Regarding the argument that the trial court's finding is contrary to Supreme Court case law, appellants cite two cases in further support of their position that where the claims of all members of a proposed class turn on a handful of common questions of

---

[8] We note that R.C. 4513.612(A)(1) states: "No towing service shall knowingly offer or provide monetary compensation in exchange for the authorization to tow motor vehicles from a specified location or on behalf of the person to whom the towing service offered or provided the compensation." Furthermore, R.C. 4513.601(G)(1) states that the owner or lienholder of a vehicle that has been towed may reclaim it upon both: (1) presenting proof of ownership or lease agreement, and (2) payment of all applicable fees as established by the public utilities commission per R.C. 4921.25. R.C. 4921.25 provides that any company engaged in the towing of motor vehicles is subject to regulation of PUCO as a "for-hire motor carrier" under R.C. Chapter 4921. It further provides that PUCO shall "establish maximum fees that may be charged by a for-hire motor carrier engaged in the towing of motor vehicles or a storage facility that accepts such vehicles under sections [R.C.] 4513.60 and 4513.601." R.C. 4921.25(B)(4). Ohio Adm.Code 4901:2-24-03 outlines maximum fees which may be charged for towing of motor vehicles and storage of motor vehicles. Ohio Adm.Code 4901:2-22-06 outlines maximum fees for after-hours retrieval. Furthermore, pursuant to R.C. 4513.601(F), a towing service is required to send multiple notices to the owner of a towed motor vehicle and any known lienholder, and 60 days after any notice is received or delivery was not possible, the towing service may initiate the process for obtaining a certificate of title to a towed motor vehicle pursuant to R.C. 4505.101.

Tim testified that Shamrock has an impound lot and if a towed motor vehicle is abandoned, they sell it as scrap or remarket it according to the Ohio Revised Code.

statutory and contractual interpretation concerning similar form contracts, those common questions predominate.

{¶ 71} In the first case cited by appellants, *Hamilton*, 82 Ohio St.3d 67, 80, the Supreme Court held predominance was met by a class of mortgagors who had or still had mortgages with interest calculated by the same method. *Hamilton* at 77. In *Hamilton*, the proposed class member claims were a common legal claim of breach of contract resulting from the common fact of the application of the same method used to calculate the interest rates on their respective loans. *Id.* The Supreme Court found members of the classes retained common claims from the common fact that the monthly payment amount on their loans was established under the same method of interest calculation, resulting in the same failures regarding their loans. *Id.* The court held: "[T]he questions of law and fact which have already been shown to be common to each respective subclass arise from identical or similar form contracts." *Id.* at 80.

{¶ 72} In the second case cited by appellants, *Cope v. Metro. Life Ins. Co.*, 82 Ohio St.3d 426 (1998), life insurance policy holders alleged the insurance company applied accumulated cash values, dividends, and interest from existing life insurance policies to fund the purchase of additional life insurance policies. *Cope* at 427, 430. The Supreme Court found that the claims of the proposed class members were not predicated on misrepresentation or actionable conduct, but, rather, the complaint asserted that a scheme was employed to collect larger commissions through the intentional omission of mandated written disclosure warnings when the life insurance policies were replaced. *Id.* at 432-33. *Cope* held "[c]ourts also generally find that a wide variety of claims may be established by common proof in cases involving similar form documents or the use of standardized procedures and practices." *Id.* at 430.

{¶ 73} The Supreme Court held in both *Hamilton* and *Cope*: "Class action treatment is appropriate where claims arise from standardized forms or routinized procedures, notwithstanding the need to prove reliance." *Hamilton* at 84, *Cope* at 435.

{¶ 74} Review of the record of the testimony of Tim reflects that although the authorization form may begin as a standardized form, the procedures imposed by Shamrock and the opportunity for property owners to provide instruction as to their

authorization for Shamrock to tow, leads this court to find the matter before us is distinguishable from *Hamilton* and *Cope*. Specifically, as articulated above, authorization forms utilized by Shamrock are not standardized as to each property owner with which Shamrock conducts a tow because not only may property owners provide their own instructions as to how tows may be conducted on their lots, property owners may also choose any or all of the towing instructions as provided by Shamrock on the authorization form. As reflected on the authorization form and through testimony presented by Shamrock, procedures employed by Shamrock to conduct tows are performed on a variety of bases, including discretionary, which will necessarily require an individualized determination as to whether the tow was authorized by the property owner. Each tow conducted will have issues subject to individualized proof as to the authorization form governing that particular property.

{¶ 75} Finally, we acknowledge appellants' argument that the trial court gave "short shrift" to the proposed contract subclass. Although the Supreme Court has held Civ.R. 23 does not require a trial court to make formal findings regarding its decision on a motion for class certification, the court did note that there are compelling reasons for findings to be made, specifically that articulated findings allow the appellate court to determine whether the trial court's discretion was within the framework of Civ.R. 23. *Hamilton* at 70-71. The Supreme Court further held that unarticulated findings relative to the trial court's analysis of Civ.R. 23 leaves a reviewing court less likely to find the trial court properly exercised its discretion. *Id.*

{¶ 76} Here, it is without question that the trial court made a one sentence conclusory finding regarding predominance as to appellants' proposed contract subclass. However, because the trial court is not mandated to make specific findings on the prerequisites for class certification, nor articulate its reasoning for its finding, we cannot on that basis alone find the trial court abused its discretion. *See Hamilton* at 70-71. Because the trial court references its extensive findings regarding appellants' proposed class and applies the same to the proposed contract subclass, we find the trial court left a framework from which we are able to review its analysis. Further, on our review of the record herein as to the need for individualized review of the facts and law as to each property owner's

authorization form, we cannot find that the record supports appellants' arguments in support of their third assignment of error.

{¶ 77} Therefore, we find the trial court did not abuse its discretion in finding the predominance requirement was not met as to appellants' proposed contract subclass.

{¶ 78} Accordingly, we overrule appellants' third assignment of error.

### D. Criteria of Ascertainability and Superiority – First and Second Assignments of Error

{¶ 79} Because class certification pursuant to Civ.R. 23 requires all seven prerequisites to be met, failure to meet the predominance requirement as to appellants' proposed class and proposed contract subclass is dispositive, rendering appellants' first and second assignments of error moot. *See Frisch's Restaurant* at ¶ 18.

## IV. Conclusion

{¶ 80} Having overruled appellants' third and fourth assignments of error as dispositive to appellants' appeal, we render appellants' first and second assignments of error moot, and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

MENTEL and NELSON, JJ., concur.

NELSON, J., retired, formerly of the Tenth Appellate District, Assigned to active duty under authority of the Ohio Constitution, Article IV, Section 6(C).